**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CENTRO DE PERIODISMO INVESTIGATIVO,
LATINOJUSTICE PRLDF, and CENTER FOR
CONSTITUTIONAL RIGHTS,

                          Plaintiffs,

        v.

DEPARTMENT OF THE TREASURY,

                       Defendant.

19 Civ. 4417 (JPO)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2761
Fax: (212) 637-2786

CHRISTOPHER CONNOLLY
Assistant United States Attorney
    - Of Counsel -

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ...................................................................................................................3

    A.    PROMESA and the Appointment of the Oversight Board ........................................3

    B.    Plaintiffs' FOIA Request, the Complaint, and Treasury's Response.........................5

    C.    The Challenged Withholdings....................................................................................6

ARGUMENT—TREASURY IS ENTITLED TO SUMMARY JUDGEMENT ON ITS
CLAIMED EXEMPTIONS ....................................................................................................8

    A.    Standard of Review...................................................................................................8

    B.    Parts of the Challenged Records are Exempt from Disclosure Under
        Exemption 5 ..............................................................................................................9

        1.    Deliberative Process Privilege.................................................................9

        2.    Attorney-Client Privilege .....................................................................14

        3.    Presidential Communications Privilege ................................................15

    C.    Parts of the Challenged Record Are Properly Withheld Under
        Exemption 6 ............................................................................................................19

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                              **Page**

*ACLU v. DHS*,
   973 F. Supp. 2d 306 (S.D.N.Y. 2013) ............................................................... 8

*ACLU v. DOD*,
   901 F.3d 125 (2d Cir. 2018) ............................................................................. 9

*Associated Press v. DOD*,
   554 F.3d 274 (2d Cir. 2009) ..................................................................... 20, 22

*Associated Press v. DOJ*,
   549 F.3d 62 (2d Cir. 2008) ....................................................................... 21, 23

*Carney v. DOJ*,
   19 F.3d 807 (2d Cir. 1994) ............................................................................. 8

*CIA v. Sims*,
   471 U.S. 159 (1985) ....................................................................................... 8

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854, 868 (D.C. Cir. 1980) ............................................................... 11

*Cook v. NARA*,
   758 F.3d 168 (2d Cir. 2014) ......................................................................... 20

*Core v. U.S. Postal Service*,
   730 F.2d 946 (4th Cir. 1984) ......................................................................... 23

*Crew v. DHS*,
   No. 06-0173 (RJL), 2008 WL 2872183 (D.D.C. July 22, 2008) ..................... 17

*DOD v. FLRA*,
   510 U.S. 487 (1994) ..................................................................................... 22

*DOJ v. Reporters Committee for Freedom of Press*,
   489 U.S. 749 (1989) ..................................................................................... 22

*Electronic Frontier Found. v. U.S. Dep't of Justice*,
   739 F.3d 1 (D.C. Cir. 2014) ........................................................................... 14

*EPA v. Mink*,
   410 U.S. 73 (1973) ....................................................................................... 12

*Estate of Ghais Abduljaami v. U.S. Dep't of State*,
No. 14 Civ. 7902 (RLE), 2016 WL 94140 (S.D.N.Y. Jan. 7, 2016) .......................................... 23

*FLRA v. Dep't of Commerce*,
962 F.2d 1055 (D.C. Cir. 1992) ....................................................................................... 21, 24

*Food Marketing Inst. v. Argus Leader Media*,
139 S. Ct. 2356 (2019) ............................................................................................................ 8

*Grand Central Partnership, Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999) .......................................................................................... 10, 11

*Hopkins v. HUD*,
929 F.2d 81 (2d Cir. 1991) ............................................................................... 9, 10, 14, 22

*In re County of Erie*,
473 F.3d 413 (2d Cir. 2007) .......................................................................................... 14, 15

*In re Grand Jury Investigation*,
399 F.3d 527 (2d Cir. 2005) .......................................................................................... 14, 15

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ............................................................................................ 16

*Judicial Watch, Inc. v. Dep't of Justice*,
365 F.3d 1108 (D.C. Cir. 2004) ............................................................................... 15, 16, 19

*Lead Industries Ass'n v. OSHA*,
610 F.2d 70 (2d Cir. 1979) ........................................................................................... 12, 13

*Leopold v. U.S. Dep't of Justice*,
487 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................................ 18

*Long v. OPM*,
692 F.3d 185 (2d Cir. 2012) ................................................................................................ 21

*Loving v. DOD*,
496 F. Supp. 2d 101 (D.D.C. 2007), 550 F.3d 32 (D.C. Cir. 2008) .................................... 17

*Multi Ag Media LLC v. Dep't of Agriculture*,
515 F.3d 1224 (D.C. Cir. 2008) .......................................................................................... 21

*NARA v. Favish*,
541 U.S. 157 (2004) ............................................................................................................ 23

*N.Y. Times Co. v. DOJ,*
  872 F. Supp. 2d 309 (S.D.N.Y. 2012) ........................................................................ 9

*Nat'l Ass'n of Retired Fed. Employees v. Horner,*
  879 F. 2d 873 (D.C. Cir. 1989) ................................................................................ 23

*Nat'l Security Archive v. CIA,*
  752 F.3d 460 (D.C. Cir. 2014) ................................................................................. 13

*Nixon v. Administrator of General Services,*
  433 U.S. 425 (1977) ......................................................................................... 16, 18

*NLRB v. Sears, Roebuck & Co.,*
  421 U.S. 132 (1975) ......................................................................................... 10, 14

*Pinson v. U.S. Dep't of Justice,*
  202 F. Supp. 3d 86 (D.D.C. 2016) ..................................................................... 20, 23

*Renegotiation Board v. Grumman Aircraft Engineering Corp.,*
  421 U.S. 168 (1975) ................................................................................................ 10

*Seife v. FDA,*
  43 F.4th 231 (2d Cir. 2022) ...................................................................................... 8

*Tax Analysts v. IRS,*
  117 F.3d 607 (D.C. Cir. 1997) ................................................................................. 14

*Tigue v. Dep't of Justice,*
  312 F.3d 70 (2d Cir. 2002) ....................................................................................... 11

*U.S. Dep't of State v. Washington Post Co.,*
  456 U.S. 595 (1982) ................................................................................. 19, 20, 22

*United States v. Nixon,*
  418 U.S. 683 (1974) ......................................................................................... 16, 18

*Washington Post Co. v. Special Inspector Gen. for Afg. Reconstruction,*
  No. 18-2622 (ABJ), 2021 WL 4502106 (D.D.C. Sept. 30, 2021) ........................... 19

*Wilner v. NSA,*
  592 F.3d 60 (2d Cir. 2009) ....................................................................................... 9

*Wisdom v. United States Trustee Program,*
  232 F. Supp. 3d 97 (D.D.C. 2017) ........................................................................... 20

*Wood v. FBI,*
   432 F.3d 78 (2d Cir. 2005) ............................................................................................. 20, 21

## STATUTES

5 U.S.C. § 552(a)(8)(A)(i) ................................................................................................ 13

5 U.S.C. § 552(b) ............................................................................................................... 8

5 U.S.C. § 552(b)(5) ...................................................................................................... 2, 9

5 U.S.C. § 552(b)(6) .................................................................................................... 2, 20

48 U.S.C. § 2121(a) ........................................................................................................... 3

48 U.S.C. § 2121(c)(1) ...................................................................................................... 3

48 U.S.C. § 2121(e)(2) ................................................................................................... 3, 4

## RULES

Fed. R. Civ. P. 56(a) ......................................................................................................... 8

## PRELIMINARY STATEMENT

Defendant the U.S. Department of the Treasury ("Treasury" or the "Department"), by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for summary judgment.

This is a Freedom of Information Act ("FOIA") matter in which plaintiffs seek records relating to then-President Barack Obama's 2016 appointment of individuals to serve on the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "Board"). The Oversight Board was established by the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("PROMESA"), 48 U.S.C. §§ 2101-2141, which was enacted in an effort to address Puerto Rico's financial crisis. PROMESA vests the Board with considerable powers, including the authority to approve Puerto Rico's budgets and fiscal plans. The statute specified that the President would appoint six of the Board's seven members from lists of candidates submitted by Congressional leadership; the seventh member would be selected by the President in his sole discretion.

Treasury played a significant role in identifying and evaluating candidates for the Oversight Board. This involved deliberations not only within the Department but also between Department personnel and the White House. The records at issue here reflect those deliberations: they consist of emails where Treasury and/or White House personnel identify, and provide candid assessments of, potential Board candidates; charts and lists where Treasury personnel highlight the relevant biographical information of potential candidates and categorize them based on various criteria such as their political affiliations or the perceived "political risk" of appointing them; and meeting materials reflecting, among other things, proposed timelines for finalizing and announcing appointments to the Board.

The parts of the challenged records Treasury withheld are properly exempt from disclosure. Treasury has primarily withheld information pursuant to Exemption 5, 5 U.S.C. § 552(b)(5), and the deliberative process privilege.  The challenged records are quintessentially deliberative: they reflect the pre-decisional ideas, views, opinions, and subjective assessments of Treasury personnel, offered as part of a frank exchange of ideas meant ultimately to facilitate recommendations to the President about who should be appointed.  In addition, part of one document is properly withheld under Exemption 5 because it falls within the scope of the attorney-client privilege: it is an email from a White House ethics attorney (copying the then-White House counsel) posing a "legal and policy question" to a Treasury attorney.  And parts of three records are also properly withheld under Exemption 5 and the presidential communications privilege; in addition to the email posing a legal and policy question, they consist of materials created by Treasury for a conference call with a senior presidential advisor and other White House staff to discuss candidates then under consideration and consider proposed steps for the appointment process.

The material Treasury withheld as deliberative is also exempt from disclosure under FOIA Exemption 6, 5 U.S.C. § 552(b)(6), because it implicates substantial privacy interests of individuals who were considered for positions on the Board—some of whom may not have known, and may still not know, they were under consideration.  The withheld information consists not only of the individuals' names, but also biographical information deemed relevant to their potential service on the Board and candid assessments of their qualifications.  In a few instances, Treasury also withheld the names of its low-ranking employees who were not substantively involved in deliberations about potential Board candidates.  The personal privacy interests implicated by the information withheld under Exemption 6 far outweigh whatever interest the public might have in its disclosure.  That is particularly true given the controversial nature of PROMESA in general and

the Oversight Board in particular; disclosing the withheld information could result in embarrassment or reputational harm, which is exactly what Exemption 6 is meant to prevent.

Because the Department's declaration establishes that its withholdings are logical and plausible, and identifies foreseeable harm from release, Treasury's motion for summary judgment should be granted.

## **BACKGROUND**

### A.   **PROMESA and the Appointment of the Oversight Board**

On June 30, 2016, in an effort to ameliorate Puerto Rico's debt crisis, President Obama signed PROMESA into law.  *See* 48 U.S.C. §§ 2101-2141; Declaration of Michelle A. Dickerman, dated June 5, 2023 ("Dickerman Decl.") ¶ 3.  Among other things, PROMESA created an Oversight Board "within the territorial government" of Puerto Rico.  48 U.S.C. § 2121(c)(1).  The Oversight Board's statutory mission is to "achieve fiscal responsibility" and ensure Puerto Rico's "access to the capital markets."  *Id.* § 2121(a).  Accordingly, the Board is vested with a variety of powers, including the authority to approve fiscal plans and budgets for Puerto Rico and its governmental instrumentalities.  *See* Dickerman Decl. ¶ 4.

PROMESA provided that the President would appoint the seven members of the Oversight Board according to a formula: "two members would be selected from lists provided by the Speaker of the House of Representatives; two members would be selected from a list provided by the Majority Leader of the Senate; one member would be selected from a list provided by the Minority Leader of the House of Representatives; one member would be selected from a list provided by the Minority Leader of the Senate; and one member would be selected by the President in his sole discretion."  *Id.* ¶ 5 (citing 48 U.S.C. § 2121(e)(2)).  "If the President followed this process, then

Senate confirmation of the Board members would not be required." *Id.* (citing 48 U.S.C. § 2121(e)(2)(E)).

Treasury "played a central role in identifying and evaluating potential candidates for the Oversight Board." *Id.* ¶ 7. "Numerous Treasury employees" were involved in this process, including the Counselor to the Secretary of the Treasury, the Director of Treasury's Office of State and Local Finance, and personnel within Treasury's Office of Domestic Finance and Office of the General Counsel. *Id.* ¶ 8. Treasury personnel identified more than 115 potential candidates, both through their own research and through discussions with members of Congress and other interested parties and groups. *Id.* ¶ 7. "While it was ultimately up to Congressional leaders to decide which candidates to include on their lists, Treasury employees communicated with leadership in both parties to solicit their initial ideas, evaluate candidates, and suggest candidates for inclusion on the lists." *Id.* "Treasury likewise communicated with the White House to solicit ideas, evaluate candidates, and suggest candidates for the seat on the Board to be filled by the President in his discretion." *Id.*

Over the course of the appointment process, Treasury personnel debated candidates, opined on their relative merits, ranked them in "tiers," sorted them by political affiliation, and grouped them by characteristics such as their perceived level of qualification and ability to work well with other Board members, and any perceived "political risks" that might accompany their appointment. *See id.* ¶¶ 9-10. At various points, Treasury personnel discussed potential candidates with White House staff, including senior presidential advisor Jason Miller, and also discussed legal and ethical issues relating to the anticipated Board appointments. *Id.* ¶¶ 9, 12. And as the list of candidates narrowed, Treasury personnel conducted vetting interviews with certain candidates, the results of which were incorporated into written evaluations. *See id.* ¶ 11.

4

President Obama appointed the seven original members of the Oversight Board on August 31, 2016.  *Id.* ¶ 14.  As of the date of this brief, three of those original members continue to serve on the Board.  *Id.*  The Board is controversial in Puerto Rico; President Obama's initial appointments were met with calls for civil disobedience and boycotts, and recent polling shows that the Board remains unpopular.  *See id.* ¶ 15 & nn.1-4.

**B.    Plaintiffs' FOIA Request, the Complaint, and Treasury's Response**

Plaintiffs, who are media and advocacy organizations, submitted their underlying FOIA request to Treasury on or about January 27, 2017.  Dickerman Decl. ¶ 16.  The request sought "all records relating to" the Oversight Board, "including, but not limited to, records relating to" the seven individuals originally appointed to the Board; it also sought a further 15 categories of records pertaining to the selection of the Board.  *See id.*

Following its receipt of the request, Treasury engaged in discussions with plaintiffs aimed at narrowing its scope.  *See id.* ¶¶ 17-18.  Treasury and plaintiffs agreed that, as an initial matter, Treasury would confine its search to correspondence between Treasury employees and the then-current members of the Oversight Board.  *Id.* ¶ 18.  Treasury then conducted searches for responsive records, but did not produce any records prior to plaintiffs' commencement of this lawsuit.  *Id.* ¶ 19.

Plaintiffs filed their complaint on or about May 16, 2019, seeking an order directing Treasury to search for, process, and produce all non-exempt records responsive to their FOIA request.  ECF No. 1; Dickerman Decl. ¶ 20.  Thereafter, Treasury produced records responsive to plaintiffs' request for correspondence with members of the Oversight Board, Dickerman Decl. ¶ 21, and when plaintiffs declined to narrow their request further, the Department conducted

further searches and produced additional responsive records on a rolling basis from September 2020 through December 2021, *id.* ¶ 22.

Following Treasury's productions, the parties met and conferred in an effort to narrow and, where possible, resolve plaintiffs' issues concerning the adequacy of Treasury's search and its application of FOIA's statutory exemptions. *See id.* ¶ 23.[1]  As part of this process, in June 2022, Treasury rereviewed, reprocessed, and rereleased certain records that plaintiffs had identified as being of particular interest. *See id.*  Based on Treasury's June 2022 rerelease, and after further discussions, plaintiffs identified 26 records withheld in part whose withholdings they continued to challenge. *Id.* ¶ 24.

## C.     The Challenged Withholdings

Broadly, the challenged withholdings fall into three categories.  The first, and largest, set of records consists of information contained in emails and attachments, circulated among Treasury personnel or among Treasury personnel and the White House, discussing potential candidates for the Oversight Board. *See, e.g.*, Dickerman Decl. ¶¶ 26-28, 30-37.  At times, the emails themselves reflect substantive discussions of potential candidates. *See, e.g.*, *id.* ¶¶ 30, 32, 33.  More often, the emails attach charts (which are sometimes also copied into the bodies of the emails) identifying and evaluating individuals under consideration for the Board. *See, e.g.*, *id.* ¶¶ 26, 28, 29.  The charts often contain biographical and other personal information about candidates deemed relevant to their potential service on the Board, such as "Candidate Name," "Source," "[Puerto Rico] Ties," "Gender," "Expertise," "Conflicts," and "Background." *See id.* ¶ 29.  Within the charts and emails, candidates are also often ranked in "tiers," or grouped according to subjective evaluations, such as "Highly Qualified Candidates with some risk" or "Candidates with less political risk but greater

---

[1]        Plaintiffs do not challenge the adequacy of Treasury's search. *Id.* ¶ 24.

chance of not being an effective board member." *See id.* ¶ 31.  In at least one instance, Treasury personnel speculated about who might be nominated by Democratic and Republican congressional leaders.  *Id.* ¶ 26.  Elsewhere, the charts break down candidates "floated by" then-Speaker of the House of Representatives Paul Ryan into an "A List" and "B List," and identify candidates Speaker Ryan had previously considered.  *See id.* ¶ 36.

Second, a much smaller set of challenged withholdings consists of materials prepared for, and circulated prior to, a conference call among Treasury and White House personnel, including senior presidential advisor Jason Miller.  *See id.* ¶¶ 29, 38.  Like the email correspondence, this material includes charts identifying and evaluating potential candidates.  *See id.*  It also includes documents proposing what steps remained in the appointment process and recommending a timeframe for undertaking them.  *See id.*

Finally, plaintiffs challenge withholdings within two emails dated just prior to President Obama's appointment decision in August 2016.  The first email is among Treasury personnel, discussing a draft "Topline Points for Puerto Rico Oversight Board Rollout" document.  *See id.* ¶ 39.  In the second email, an Ethics Counsel in the White House Counsel's Office poses a "legal and policy question" to a Treasury attorney, copying the then-White House counsel, Dana Remus. *See id.* ¶ 40 & Ex. 17.

All but three of the records at issue are withheld in part pursuant to Exemption 5 and the deliberative process privilege.  *Id.* ¶ 45.  The material withheld as deliberative is also largely withheld on privacy grounds pursuant to Exemption 6.  *See id.* ¶ 62-65.  In addition, in three records, Treasury has withheld the names of low-level employees pursuant to Exemption 6.  *Id.* ¶ 66.  One record is withheld in part pursuant to Exemption 5 and the attorney-client privilege, *id.*

¶ 54, and parts of three records are withheld pursuant to Exemption 5 and the presidential communications privilege, *see id.* ¶¶ 57, 61.

## ARGUMENT

### TREASURY IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMED EXEMPTIONS

**A.     Standard of Review**

While FOIA generally requires disclosure of agency records, the statute recognizes "that public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166–67 (1985), and exempts several categories of records from disclosure, *see* 5 U.S.C. § 552(b).  "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (citations, quotation marks, and alterations omitted).  An agency may withhold records if it reasonably foresees that disclosure either is prohibited by law or would harm an interest protected by an exemption.  5 U.S.C. § 552(a)(8)(i); *see Seife v. FDA*, 43 F.4th 231, 235 (2d Cir. 2022).

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." *ACLU v. DHS*, 973 F. Supp. 2d 306, 313 (S.D.N.Y. 2013).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In a FOIA case, "[a]ffidavits or declarations . . . supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994).[2]  Such

---

[2]     "The general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment, and Local Civil Rule 56.1 statements are not required."

declarations are "accorded a presumption of good faith," *id.* (quotation marks omitted), and "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical [and] plausible," *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009) (citation and quotation marks omitted); *see ACLU v. DOD*, 901 F.3d 125, 133-34 & n.9 (2d Cir. 2018) (as amended).

Here, the adequacy of Treasury's search is not in dispute; plaintiffs challenge only the agency's withholding of parts of 26 records.  Dickerman Decl. ¶ 24.  Treasury's declaration amply satisfies the agency's burden to show that the information withheld from the challenged records falls within one or more exemptions, and it is reasonably foreseeable that release of the withheld information would harm the interests protected by the exemptions asserted.  Treasury is therefore entitled to summary judgment.

## B.    Parts of the Challenged Records Are Exempt from Disclosure Under Exemption 5

Treasury properly withheld parts of the challenged records pursuant to Exemption 5, which protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  "By this language, Congress intended to incorporate into the FOIA all the normal civil discovery privileges."  *Hopkins v. HUD*, 929 F.2d 81, 84 (2d Cir. 1991).

The challenged records qualify for protection under Exemption 5 because they are "inter-agency or intra-agency memorandums."  5 U.S.C. § 552(b)(5).  Specifically, they are "communications among Treasury employees or between Treasury and the White House."  Dickerman Decl. ¶ 43.  And the withheld material falls within one or more of three privileges

---

*N.Y. Times Co. v. DOJ*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (quotation marks and alterations omitted).  Accordingly, Treasury has not submitted a Local Rule 56.1 statement in support of its motion.

protected by Exemption 5: the deliberative process privilege; the attorney-client privilege; and the presidential communications privilege.

### 1.    Deliberative Process Privilege

The bulk of Treasury's Exemption 5 withholdings are made pursuant to "the 'deliberative process' or 'executive' privilege, which protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions."[3]  *Hopkins*, 929 F.2d at 84; *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975) ("those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision making process" (quotation marks omitted)).

To fall within the deliberative process privilege, an agency record must satisfy two criteria: it "must be both 'predecisional' and 'deliberative.'"  *Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (citations omitted).  A document is "predecisional" when it "precedes, in temporal sequence, the 'decision' to which it relates," *id.*, and is "prepared in order to assist an agency decisionmaker in arriving at his decision," *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184 (1975).  "A document is 'deliberative' when it is actually . . . related to the process by which policies are formulated."  *Grand Central*, 166 F.3d at 482 (quotation marks omitted; alteration in original).  In determining whether a document is deliberative, courts look to whether the document "formed an important, if not essential, link in [the agency's] consultative process," *id.* at 483, whether it reflects the opinions of the author rather than the policy of the agency, *id.*; *Hopkins*, 929 F.2d at 85, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]," *Grand Central*, 166 F.3d at

---

[3]    All but three of the challenged records (UST_1360, UST_2795-98, and UST_2862) are withheld in part pursuant to the deliberative process privilege.  Dickerman Decl. ¶ 45.

483. Predecisional, deliberative documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Tigue v. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002) (quotation marks omitted); *Grand Central*, 166 F.3d at 482.

The challenged withholdings meet both criteria necessary for the deliberative process privilege to apply. First, the records are predecisional: Treasury personnel created the records as part of the process of advising and assisting the President in reaching final determinations regarding who to appoint to the Oversight Board. Dickerman Decl. ¶ 45; *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) ("a document from a subordinate to a superior official is more likely to be predecisional"). As such, they "did not constitute the government's final position concerning either appointments to the Board or the process by which appointments would be made, and they do not embody any final Executive Branch action." Dickerman Decl. ¶ 46. Second, the challenged withholdings are deliberative: they formed part of a consultative process by which subordinates formulated recommendations for deciding officials, setting forth the subordinates' subjective opinions on issues such as who should be considered for the Board; what elements of the potential candidates' backgrounds, political views, and personalities might enhance (or detract from) their potential appointment to the Board; and how the candidates compared to one another. *See id.* ¶ 47. Moreover, the challenged withholdings reflect Treasury employees' evaluation of information the Department compiled about each potential candidate, and they reflect those employees' subjective determinations concerning the most relevant information to present to the decisionmaker. *See id.* ¶ 48. Put another way, "[t]he decision to include or exclude certain information gathered in the course of Treasury's

consideration of the potential candidates was itself an inherent part of the deliberative process." *Id.*

The challenged withholdings do not contain any purely factual material that could be reasonably segregated for release. Factual material may fall outside the scope of the deliberative process privilege if it "'is severable without compromising the private remainder of the documents.'" *Lead Industries Ass'n v. OSHA*, 610 F.2d 70, 85 (2d Cir. 1979) (quoting *EPA v. Mink*, 410 U.S. 73, 91 (1973)). But "[i]f the factual materials are 'inextricably intertwined' with policy making recommendations so that their disclosure would 'compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5' . . . the factual materials themselves fall within the exemption." *Id.* (quoting *Mink*, 410 U.S. at 92). That is precisely the situation here.

Any factual material contained in the challenged records is inextricably intertwined with the explicitly evaluative nature of the records as a whole. *See Lead Industries*, 610 F.2d at 85 ("More is required than merely plucking factual segments from the reports[;] there must be a sensitive reference to the relation of the factual segments to the report as a whole."). The challenged records contain a selection of factual information drawn from publicly available records or from the potential candidates themselves; they also reflect Treasury personnel's attempts to summarize and present key background information concerning the candidates that they believed would be relevant for the final decisionmaker to consider. *See* Dickerman Decl. ¶ 48. So, for example, when the chart at UST_1292 "provides biographical information deemed relevant to the listed candidates' potential service on the Board," it does so in order to facilitate, and explain, Treasury employees' sorting of those candidates into groups such as "Highly Qualified Candidates with some risk" and "Candidates with less political risk but greater chance

of not being an effective board member." *See* Dickerman Decl. ¶ 31 & Ex. 8.  That information

cannot be uncoupled from the record's privileged deliberations.  Disclosure of the factual

information that Treasury deemed relevant to its evaluations of potential Board candidates would

constitute a breach of the deliberative process privilege: that very "selection of the facts thought

to be relevant is part of the deliberative process" because "it necessarily involves policy-oriented

*judgment*." *Nat'l Security Archive v. CIA*, 752 F.3d 460, 465 (D.C. Cir. 2014) (citation and

quotation marks omitted; emphasis in original); *accord Lead Industries*, 610 F.2d at 85

("Disclosing factual segments from the . . . summaries would reveal the deliberative process of

summarization itself by demonstrating which facts in the massive rule-making record were

considered significant.").

        In accordance with the FOIA Improvement Act of 2016, 5 U.S.C. § 552(a)(8)(A)(i),

Treasury has also shown that disclosure of the withheld portions of the challenged records would

foreseeably harm the interests protected by Exemption 5 and the deliberative process privilege.

"Release of the withheld portions of these documents would have a chilling effect on the free

exchange of opinions and ideas by Treasury officials and staff involved in future efforts to identify

candidates for future appointments." Dickerman Decl. ¶ 49.  If Treasury employees were reluctant

to share their candid opinions in such situations, it "would restrict Treasury's ability to advise

decisionmakers on candidates for appointment to important governmental positions," which, in

turn, "would adversely affect Treasury's ability to assist decisionmakers, including the President,

in appointing individuals that best represent the interests of the U.S. government and U.S.

taxpayers." *Id.*  Disclosure of the withheld material would also harm interests protected by

Exemption 5 and the deliberative process privilege insofar as the withheld information was

obtained from the potential candidates themselves, for example during vetting interviews: "[i]f

13

candidates for government office believe that statements in vetting interviews could later become public under FOIA, they are unlikely to feel at liberty to respond candidly." *Id.* ¶ 50. That "would deprive Treasury of valuable information necessary to its deliberations." *Id.* Treasury's articulation of these harms satisfies the foreseeable harm requirement. *See Electronic Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014).

Because the challenged records are quintessential documents "'reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated,'" *Hopkins*, 929 F.2d at 84-85 (quoting *Sears*, 421 U.S. at 150), they are properly withheld under Exemption 5 and the deliberative process privilege.

### 2.    Attorney-Client Privilege

Treasury properly withheld part of one record pursuant to Exemption 5 and the attorney-client privilege.[4] "The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997). The purpose of the privilege "is to encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (quotation marks omitted). Indeed, "the traditional rationale for the [attorney-client] privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law . . . be encouraged to seek out and receive fully informed legal advice." *Id.* at 419 (quoting *In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005)). Upholding the attorney-client privilege for government actors "furthers a

---

[4]     The record withheld in part pursuant to the attorney-client privilege is UST_2862. Dickerman Decl. ¶ 60.

culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business," while "[a]brogating the privilege undermines that culture and thereby impairs the public interest." *Id.* (quoting *In re Grand Jury Investigation*, 399 F.3d at 534).

Treasury's sole invocation of Exemption 5 and the attorney-client privilege is proper. In the withheld portion of UST_2862, "a White House Ethics Counsel asks Treasury's Assistant General Counsel (General Law, Ethics, and Regulation) for Treasury's position on a 'legal and policy question.'" Dickerman Decl. ¶ 54. "This is covered by the attorney-client privilege because it consists of a question from a White House attorney to a Treasury attorney about what the law requires on a particular issue related to ethics and the Oversight Board." *Id.* ¶ 55; *accord County of Erie*, 473 F.3d at 418 (privilege extends to "confidential communications . . . that are made for the purpose of obtaining . . . legal assistance"). Release of this information would foreseeably harm the interests protected by Exemption 5 and the attorney-client privilege by discouraging the free exchange of information between agency counsel and their clients, chilling government officials from seeking or providing legal guidance, and endangering agency attorneys' ability to provide the best possible legal representation. Dickerman Decl. ¶ 55; *see County of Erie*, 473 F.3d at 418. Accordingly, Treasury properly withheld that challenged record in part under the attorney-client privilege and Exemption 5.

### 3.    Presidential Communications Privilege

Finally, Treasury properly withheld parts of three records pursuant to Exemption 5 and the presidential communications privilege.[5]  *See Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d

---

[5]    The records withheld in part pursuant to the presidential communications privilege are UST_2389-97, UST_2398-4000, and UST_2862. Dickerman Decl. ¶¶ 57, 61. The parts of UST_2389-97 and UST_2398-4000 withheld pursuant to the presidential communications

1108, 1113-14 (D.C. Cir. 2004) (Exemption 5 exempts from disclosure information protected by the presidential communications privilege).  The presidential communications privilege protects "communications 'in performance of a President's responsibilities,' . . . 'of his office,' . . . and made 'in the process of shaping policies and making decisions.'"  *Nixon v. Administrator of General Services*, 433 U.S. 425, 449 (1977) ("*Nixon II*") (quoting *United States v. Nixon*, 418 U.S. 683, 708, 711, 713 (1974) ("*Nixon I*")).  The privilege recognizes that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."  *Nixon I*, 418 U.S. at 708.

The presidential communications privilege is broad.  It "'applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones.'"  *Judicial Watch*, 365 F.3d at 1114 (quoting *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997)); *see also In re Sealed Case*, 121 F.3d at 745 ("Even though the presidential privilege is based on the need to preserve the President's access to candid advice, none of the cases suggest that it encompasses only the deliberative or advice portions of documents.").  In addition to protecting communications directly with the President, the privilege protects communications with senior presidential advisers, including "both [ ] communications which these advisers solicited and received from others as well as those they authored themselves," in order to ensure that such advisers investigate issues and provide appropriate advice to the President.  *In re Sealed Case*, 121 F.3d at 752.  And the privilege extends to both presidential communications and to records memorializing or

---

privilege are also withheld under the deliberative process privilege.  *See id.* ¶ 57.  The part of UST_2862 withheld pursuant to the presidential communications privilege is also withheld under the attorney-client privilege.  *See id.* ¶ 61.  Accordingly, the Court need not reach the applicability of the presidential communications privilege if it determines those other privileges apply.

reflecting such communications.  *See CREW v. DHS*, No. 06-0173 (RJL), 2008 WL 2872183, at *2 (D.D.C. July 22, 2008) (documents memorializing communications that were solicited and received by the President or his immediate advisers are subject to presidential communications privilege).

The three challenged withholdings over which Treasury asserted Exemption 5 and the presidential communications privilege fall within the bounds of the privilege.[6]  Two of the records comprise materials sent from Treasury personnel to a senior presidential advisor and other White House personnel in anticipation of a call to discuss potential Board candidates and proposed steps for selecting and announcing the members of the Board.  *See* Dickerman Decl. ¶¶ 38, 57, 58 & Ex. 15.  The first document, UST_2389-97, identifies candidates (including ones who were no longer under consideration), sorts the candidates into tiers, and supplies information about the candidates deemed relevant to their potential service on the Board.  *See id.* ¶¶ 38, 58 & Ex. 15.  The second document, UST_2398-2400, identifies remaining steps that needed to be taken with respect to the appointment process, proposes a timeline for completing that process, and discusses possible outreach to certain stakeholders.  *See id.* ¶¶ 38, 59 & Ex. 15.  Finally, UST_2862 is an email from an ethics attorney in the White House counsel's office (copying the then-White House counsel) to a Treasury attorney, seeking Treasury's advice on a "legal and policy question."  *See id.* ¶¶ 40, 61 & Ex. 17.

These are privileged presidential communications.  The call materials are "communications between Treasury officials and staff and a senior advisor to the President—the Deputy Assistant

---

[6]      In the FOIA context, the presidential communications privilege need not be invoked by the President himself, but instead may be asserted by the agency withholding the records in question.  *See, e.g.*, *Loving v. DOD*, 496 F. Supp. 2d 101, 108 (D.D.C. 2007), *aff'd*, 550 F.3d 32 (D.C. Cir. 2008).

to the President and Deputy Director of the National Economic Council, Jason Miller—as well as other White House staff working for senior presidential advisors." *Id.* ¶ 57.  The email is among Treasury and White House attorneys, including the White House Counsel.  *See id.* Ex. 17.  The records were created and disseminated in connection with advising the President in connection with his statutory obligation to appoint the members of the Oversight Board.  *Id.*  As such, the personnel involved in creating these records would have reasonably expected their recommendations to remain confidential.  *Id.* ¶ 57.  The records formed an integral part of the President's decision-making process, and contain, among other things, recommendations concerning who to appoint to the Oversight Board, how that appointment process should unfold, and how the White House should handle ethics issues pertaining to the appointment of the Board members.  *See id.* ¶¶ 38, 40, 56-61.

Disclosure of these records would inhibit the free flow of information and candid exploration of issues between the President and his advisors that lies at the heart of the presidential communications privilege.  *See id.* ¶¶ 60, 61; *see also Nixon II*, 433 U.S. at 449-50.  As Treasury explains, "senior presidential advisors within the White House may solicit the expertise of Executive Branch agencies that are subject to FOIA in evaluating candidates for the President to appoint."  Dickerman Decl. ¶ 60.  "But if such communications—including frank assessments of the strengths and weaknesses of potential candidates—may later become public, the President and his advisors will be less likely to seek out and obtain candid this advice."  *Id.*; *see Nixon I* (privilege is meant to protect views "many would be unwilling to express except privately").  Thus, "release of these records would infringe on the free and candid exchange of opinions and recommendations designed to advise the President."  *Id.*  Treasury's articulation of these foreseeable harms from disclosure is sufficient to carry its burden on summary judgment.  *See, e.g.*, *Leopold v. U.S. Dep't*

18

*of Justice*, 487 F. Supp. 3d 1, 10 n.4 (D.D.C. 2020) (foreseeable harm standard met because "disclosing transition deliberations would jeopardize the ability of future Presidents-elect to have full and candid discussions with their advisers"); *Washington Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-2622 (ABJ), 2021 WL 4502106, at *23 (D.D.C. Sept. 30, 2021) (standard satisfied where declarant explained that disclosure would "burden[] the ability of the President and his advisors to engage in a confidential and frank decision-making process and chill[] or inhibit[] their ability to have candid discussions, thus impacting the efficiency of government policy-making"). Accordingly, the withheld parts of these records are exempt from disclosure. *See Judicial Watch*, 365 F.3d at 1113.

**C.      Parts of the Challenged Records Are Properly Withheld Under Exemption 6**

Treasury withheld three categories of information in the challenged records pursuant to FOIA Exemption 6: (i) the names, biographical information, and other personal identifying information of individuals who were considered, but not selected, for appointment to the Oversight Board; (ii) Treasury and White House personnel's evaluations and candid assessments of Board candidates, including both those who were not selected and some who were ultimately appointed to the Board; and (iii) the names of low-level Treasury employees who did not play a substantive, policymaking role in the appointment deliberations. Dickerman Decl. ¶ 63.[7] These categories of information are exempt from disclosure.

Exemption 6 exempts from public disclosure "personnel and medical and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5

---

[7]      All but two of the challenged records (UST_2398-2400 and UST_2862) contain information withheld pursuant to Exemption 6. With the exception of the names of low-level Treasury employees (UST_1293, UST_1360, UST_2795-98), the information withheld pursuant to this exemption is also withheld pursuant to Exemption 5 and the deliberative process privilege.

U.S.C. § 552(b)(6).  The purpose of Exemption 6 is to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982).  In determining whether personal information is exempt from disclosure under Exemption 6, courts must "balance the public need for the information against the individual's privacy interest."  *Associated Press v. DOD*, 554 F.3d 274, 291 (2d Cir. 2009); *Wood v. FBI*, 432 F.3d 78, 86 (2d Cir. 2005).

The threshold inquiry under Exemption 6 is whether the records at issue constitute "personnel and medical and similar files."  5 U.S.C. § 552(b)(6).  The statutory language concerning files "similar" to personnel or medical files has been read broadly by the Supreme Court to encompass any "information which applies to a particular individual . . . sought from Government records."  *Washington Post Co.*, 456 U.S. at 602; *accord Cook v. NARA*, 758 F.3d 168, 174-75 (2d Cir. 2014).  The withheld portions of the records at issue qualify as "similar files" under that standard, because they contain the names and other personally identifying information of individuals who Treasury and White House personnel discussed as potential members of the Oversight Board.  *See generally* Dickerman Decl. ¶¶ 25-40, 64, 65.  Indeed, "[i]t is well established that identifying information such as names, addresses, and other personal information falls within the ambit of privacy concerns under FOIA."  *Associated Press v. DOD*, 554 F.3d at 285.  More broadly, biographical information such as employment history found in these records also qualifies for protection under Exemption 6, *see, e.g.*, *Pinson v. U.S. Dep't of Justice*, 202 F. Supp. 3d 86, 114 (D.D.C. 2016) (curriculum vitae of unsuccessful candidate for Bureau of Prisons position is "similar" file entitled to Exemption 6 protection), as do Treasury and White House employees' candid assessments of candidates' suitability for a position on the Board, *cf. Wisdom v. United States Trustee Program*, 232 F. Supp. 3d 97, 126 (D.D.C. 2017) ("[A] person has a substantial

privacy interest in a supervisor's candid evaluation of his performance." (citing, *inter alia*, *FLRA v. Dep't of Commerce*, 962 F.2d 1055, 1059-61 (D.C. Cir. 1992))).

Because the records at issue here are the types of records protected by Exemption 6, the Court must next consider the privacy interests at stake. "The privacy side of the balancing test is broad and encompasses all interests involving the individual's control of information concerning his or her person." *Wood*, 432 F.3d at 88; *see also Associated Press v. DOJ*, 549 F.3d 62, 65 (2d Cir. 2008) (per curiam). "[T]he bar is low: FOIA requires only a measurable interest in privacy to trigger the application of the disclosure balancing tests." *Long v. OPM*, 692 F.3d 185, 191 (2d Cir. 2012); *see also Multi Ag Media LLC v. Dep't of Agriculture*, 515 F.3d 1224, 1229-30 (D.C. Cir. 2008) (to be protected, the individual's privacy interest in the information's nondisclosure need only be more than *de minimis*).

The privacy interests of the individuals identified in the challenged records easily clear this low bar. The low-level Treasury employees whose names appear on a small number of these records plainly have an interest in maintaining their privacy. As Treasury explains, its policy is to withhold the names of employees below the Senior Executive Service ("SES") level, and while it has released many names below SES level in this litigation "so as to provide plaintiffs with a full picture of the individuals who were most involved in this process," the individuals whose names have been withheld were not substantively involved in deliberations, and releasing them "might nonetheless subject them to embarrassment and harassment." Dickerman Decl. ¶ 66. The privacy interest of the candidates who were considered is also substantial. The Oversight Board is controversial and unpopular in Puerto Rico. *See id.* ¶¶ 15 & nn.1-4, 64, 65. Disclosing the names and other personal information of individuals that Treasury employees identified as potential Board candidates—some of whom might not have known, and may still not know, they were under

consideration—would potentially subject them to reputational harm based merely on this tangential connection to the Board.  *See id.* ¶ 64.  Indeed, apart from the reputational harm that might stem from being associated with the Board, the fact that an individual was considered but not selected for the position implicates these individuals' privacy interests.  *See id.*  And all candidates—including those who were ultimately selected—have a substantial privacy interest in government personnel's candid opinions of their fitness for a position on the Board and the potential pros and cons of appointing them.  *See id.* ¶ 65.  This would include, in some instances, assessments that the individual's appointment would be politically risky or that they might not work well with other Board members.  *See id.* ¶¶ 31, 65.  Disclosing that information implicates considerable privacy interests because it could lead to precisely the "injury and embarrassment . . . from the unnecessary disclosure of personal information" the exemption is meant to prevent.  *Washington Post Co.*, 456 U.S. at 599.

On the other side of the ledger, the Supreme Court has clearly instructed that the "*only* relevant public interest in disclosure to be weighed in [the Exemption 6] balance is the extent to which disclosure would serve the core purpose of the FOIA, which is *contributing significantly* to public understanding of the operations or activities of the government."  *DOD v. FLRA*, 510 U.S. 487, 495 (1994) (second emphasis added; quotation marks and alteration omitted; quoting *DOJ v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 775 (1989)); *accord Hopkins v. HUD*, 929 F.2d 81, 88 (2d Cir. 1991).  "Goals other than opening agency action to public scrutiny are deemed unfit to be accommodated under FOIA when they clash with privacy rights."  *Associated Press v. DOD*, 554 F.3d at 293 (citation and quotation marks omitted).  And "[t]he requesting party bears the burden of establishing that disclosure of personal information would serve a public

interest cognizable under FOIA." *Associated Press v. DOJ*, 549 F.3d at 66 (citing *NARA v. Favish*, 541 U.S. 157, 172 (2004)).

Plaintiffs cannot meet their burden to show that the information withheld under Exemption 6 would contribute significantly to public understanding of government activities. There is little, if any, public interest in the names of low-level Treasury employees who played no substantive role in the consideration of potential Board members. Dickerman Decl. ¶ 66; *see, e.g.*, *Estate of Ghais Abduljaami v. U.S. Dep't of State*, No. 14 Civ. 7902 (RLE), 2016 WL 94140, at *8 (S.D.N.Y. Jan. 7, 2016) (where there is no cognizable public interest in disclosure of personal information, "the information should be protected; something, even a modest privacy interest, outweighs nothing every time" (quoting *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F. 2d 873, 879 (D.C. Cir. 1989))). Indeed, here, Treasury relaxed its own policy concerning the redaction of employee names in an effort to provide plaintiffs with as much information as possible. Dickerman Decl. ¶ 66. Nor can plaintiffs make out a substantial public interest in the personal information of individuals who were considered, but not selected, for the Board. "Disclosure of the qualifications of people who were not appointed is unnecessary for the public to evaluate the competence of people who were appointed"; accordingly, "the public interest in learning the qualifications of people who were not selected to conduct the public's business is slight." *Core v. U.S. Postal Service*, 730 F.2d 946, 949 (4th Cir. 1984); *accord Pinson*, 202 F. Supp. 3d at 114. That "slight" interest is outweighed here by the privacy interests implicated by disclosure, especially given that some candidates might never have known they were considered, and particularly in light of the controversy surrounding the Board. *See* Dickerman Decl. ¶ 64. Lastly, whatever public interest exists in the disclosure of government employees' evaluations of candidates—including those who were selected—does not tip the balance. The views of mid-level

Treasury employees might not have even reached the President, and in any event might not correspond to the President's reasons for selecting (or not selecting) a particular candidate.  *See* Dickerman Decl. ¶ 51.  Any public interest in those subjective views does not outweigh the significant privacy interests at stake.  *See id.* ¶ 65; *cf. FLRA v. Dep't of Commerce*, 962 F.2d at 1060 ("A mandatory personnel evaluation, whether favorable or not, is intensely personal.").

Indeed, here, any public interest in disclosure is outweighed by the public interest in withholding the types of personal information found in the challenged records.  As Treasury explains, appointing individuals to government positions is a core presidential responsibility that benefits from robust internal deliberation within the Executive Branch.  *See* Dickerman Decl. ¶¶ 49, 50, 55.  Not only does it require the free exchange of viewpoints among government personnel, but it also requires the participation of certain candidates under consideration, by, for example, providing complete and candid information during vetting interviews.  *See id.* ¶¶ 50, 65.  Requiring the disclosure of information about individuals who were merely considered during internal government discussions but were not appointed, or government employees' frank (and pre-decisional) opinions about candidates under consideration, would adversely affect the process of identifying, gathering information about, and evaluating candidates for these positions.

Because the privacy and public interests favor protection of the withheld personal information in the records at issue, and because those interests outweigh any public interest in disclosure, Treasury's application of Exemption 6 was proper.

## **CONCLUSION**

For the foregoing reasons, and those set forth in the accompanying agency declaration,

Treasury's motion for summary judgment should be granted.

Dated: New York, New York
      June 5, 2023

                            DAMIAN WILLIAMS
                            United States Attorney for the
                            Southern District of New York
                            *Counsel for Defendant*

                              */s/ Christopher Connolly*
By:    CHRISTOPHER CONNOLLY
          Assistant United States Attorney
          86 Chambers Street, 3rd Floor
          New York, New York 10007
          Tel.: (212) 637-2761
          Fax: (212) 637-2786
          E-mail: christopher.connolly@usdoj.gov