## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTRO DE PERIODISMO INVESTIGATIVO, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF THE TREASURY, <br><br> Defendant. | Civil Action No. 1:19-Civ.-4417 (JPO) |

### DECLARATION OF MICHELLE A. DICKERMAN

I, Michelle A. Dickerman, declare the following to be a true and correct statement of facts:

1.      I am Deputy Assistant General Counsel for Litigation, Oversight, and Financial Stability in the Banking and Finance section of the Office of the General Counsel at the Department of the Treasury (the "Department" or "Treasury").  I supervise a team of Attorney-Advisors who work on a diverse set of legal issues, including Freedom of Information Act ("FOIA") litigation.  I have supervised the Attorney-Advisors who have worked on this case from the date it was filed through the present.

2.      I respectfully submit this declaration in support of the Department's motion for summary judgment on its application of FOIA's statutory exemptions to portions of the challenged records.  The statements made in this declaration are based on my review of the documents produced in this case, including the challenged records, and on information furnished to me in the course of my official duties.

**PROMESA and the Department's Role in Evaluating Candidates for the Oversight Board**

3.      On June 30, 2016, President Barack Obama signed into law the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), codified at 48 U.S.C. §§ 2101–2141.  Congress enacted PROMESA in response to Puerto Rico's acute debt crisis, which had called into question "the Commonwealth's very ability to persist."  *Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, 174 F. Supp. 3d 585, 592 (D.P.R. 2016).

4.      A central feature of PROMESA is the creation of a Financial Oversight and Management Board "within the territorial government" of Puerto Rico.  48 U.S.C. § 2121(c)(1). The Oversight Board's statutory mission is to "achieve fiscal responsibility" and ensure Puerto Rico's "access to the capital markets."  *Id.* § 2121(a).  Accordingly, the Board is vested with extensive authority over Puerto Rico's fiscal matters, including the power to approve fiscal plans and budgets for the Commonwealth and its instrumentalities, *id.* §§ 2141–2142; enforce budget and fiscal plan compliance, *id.* §§ 2143–2144; approve the territorial government's issuance of debt or its guarantee, modification, or similar transactions with respect to its debt, *id.* § 2147; and file petitions to adjust debts under Title III of PROMESA through procedures similar to Chapter 9 of the Bankruptcy Code, *id.* §§ 2161–2177.  In addition, the Oversight Board acts as the sole representative of the debtor in a Title III proceeding.  *Id.* § 2175(b).  The Oversight Board will terminate once the Commonwealth has adequate access to credit markets at reasonable interest rates and has achieved balanced budgets for four consecutive years.  *Id.* § 2149.

5.      PROMESA provided that the President would appoint the seven members of the Oversight Board according to a formula whereby two members would be selected from lists provided by the Speaker of the House of Representatives; two members would be selected from a list provided by the Majority Leader of the Senate; one member would be selected from a list provided by the Minority Leader of the House of Representatives; one member would be selected

from a list provided by the Minority Leader of the Senate; and one member would be selected by the President in his sole discretion.  48 U.S.C. § 2121(e)(2).  If the President followed this process, then Senate confirmation of the Board members would not be required.  48 U.S.C. § 2121(e)(2)(E).

6.  PROMESA also required that the President appoint the seven members of the Oversight Board by September 1, 2016; otherwise, he would be required to select members from the relevant congressional lists by September 15, 2016, and would no longer have the discretion to appoint his own members with the advice and consent of the Senate.  48 U.S.C. § 2121(e)(2)(G).

7.  Because the Department had been deeply involved in drafting PROMESA, it also played a central role in identifying and evaluating potential candidates for the Oversight Board. Treasury personnel brainstormed names among themselves and solicited ideas from members of Congress and other interested parties or groups.  Throughout this process, Treasury identified and considered more than 115 potential candidates for the Oversight Board.  While it was ultimately up to Congressional leaders to decide which candidates to include on their lists, Treasury employees communicated with leadership in both parties to solicit their initial ideas, evaluate candidates, and suggest candidates for inclusion on the lists.  Treasury likewise communicated with the White House to solicit ideas, evaluate candidates, and suggest candidates for the seat on the Board to be filled by the President in his discretion.

8.  Numerous Treasury employees worked to evaluate the universe of potential candidates.  The effort was led by Antonio Weiss, then-Counselor to the Secretary of the Treasury. The then-Director of Treasury's Office of State and Local Finance, Kent Hiteshew, conducted much of the day-to-day work on the issue, and personnel within Treasury's Office of Domestic Finance and Office of the General Counsel played significant roles in the process.

9.  In order to narrow the universe of potential candidates, Treasury employees debated the relative merits of different candidates, ranked candidates by order of preference (such as listing

some candidates as "First Tier," "Second Tier," etc.), and discussed which candidates would potentially work well together.  Treasury employees also worked with White House staff to evaluate potential Oversight Board candidates.  Because of the unique nature of the Oversight Board selection process, Treasury employees kept separate lists for potential Democratic and Republican candidates.

10.     The lists of potential candidates evolved over time and took numerous forms.  Some lists included robust descriptions of potential candidates and their backgrounds. Others were high-level summaries that sorted candidates in categories based on relevant characteristics such as "Highly-Qualified Candidates on a Congressional List," "Highly-Qualified Candidates with some risk," "Highly-Qualified Candidates with conflicts that would require a Presidential waiver to adequately serve," and "Candidates with less political risk but greater chance of not being an effective board member (e.g. persuasive with other Board members)."

11.     As deliberations over potential Oversight Board candidates progressed, Treasury employees conducted vetting interviews with some candidates.  During those interviews, Treasury staff asked candidates about their backgrounds, views on Puerto Rico's fiscal crisis, and potential conflicts of interest.  Treasury employees then used the information gleaned from the interviews to produce written evaluations of candidates.  Treasury employees advised the then-Secretary of the Treasury, Jacob Lew, about their assessments of potential candidates, and also provided their evaluations to White House personnel.  Treasury personnel also communicated with Congressional leadership to advise on whether certain candidates should or should not be included on the final lists of candidates.

12.     Once the list of potential candidates had narrowed, the Presidential Personnel Office at the White House began to solicit information directly from potential candidates, including conflict of interest information.  White House staff, along with Treasury personnel, conducted further interviews of the remaining potential candidates.  Treasury employees coordinated with White

House staff on interview scheduling and, following the interviews, they deliberated with White House staff about the merits of potential candidates. White House counsel also conferred with Treasury attorneys about legal and ethics issues.

13.     Near the conclusion of the selection process, Treasury employees and White House staff deliberated over a timeline for the complex process of consulting with congressional leaders on their lists of candidates, vetting candidates and conducting ethics reviews, and finalizing appointments. Treasury employees and White House staff also consulted with one another to draft talking points and press releases in anticipation of the Oversight Board members' appointments.

14.     On August 31, 2016, President Obama appointed the seven original members of the Oversight Board: Andrew Biggs; Jose B. Carrión III; Carlos M. Garcia; Arthur J. González; José R. González; Ana J. Matosantos; and David A. Skeel, Jr. The Board's composition has changed over time. Three of the original members (Biggs, Arthur J. González, and Skeel) remain on the Oversight Board as of the date of this declaration.

15.     The Oversight Board has met with significant disapproval in Puerto Rico.[1] The appointment of the Board was met with calls for civil disobedience and boycotts.[2] More recent public opinion polling has shown that the Oversight Board remains profoundly unpopular in Puerto

---

[1] *See, e.g.*, *Judge Approves Deal to Resolve Puerto Rico Bankruptcy*, N.Y. TIMES, Jan. 18, 2022, *available at* https://www.nytimes.com/2022/01/18/us/puerto-rico-bankruptcy.html ("The unelected board, which was created by Congress, is far from well loved in Puerto Rico, where many of the island's more than three million people refer to it as 'la junta.'").

[2] *See, e.g.*, *Judge Torruella calls for 'economic boycott' and 'civil resistance' against fiscal board*, CARIBBEAN BUSINESS, Sept. 11, 2016, *available at* https://caribbeanbusiness.com/judge-torruella-requests-economic-boycott-and-civil-resistance-against-fiscal-board/?cn-reloaded=1.

Rico.[3]  There have been numerous protests against the Oversight Board.[4]  In addition, numerous

lawsuits have challenged the constitutionality of various aspects of PROMESA, including, notably,

*Financial Oversight & Management Board for Puerto Rico v. Aurelius Investment, LLC*, 140 S. Ct.

1649 (2020), which challenged the constitutionality of the process of appointments to the Oversight

Board.

### Plaintiffs' FOIA Request, the Instant Litigation, and the Department's Production of Responsive Records

16.     On or about January 27, 2017, Treasury received a FOIA request from Centro de

Periodismo Investigativo, LatinoJustice PRLDEF, and the Center for Constitutional Rights

(together, the "plaintiffs").  The request sought "all records relating to" the Oversight Board,

"including, but not limited to, records relating to" the seven individuals originally appointed to the

Board.  The request further sought an additional 15 categories of records pertaining to the selection

of the Oversight Board, including:

- records "indicating the criteria that were used to evaluate and select the candidates for the Board";

- records identifying "which agencies, entities or personnel" determined the selection criteria and were involved in evaluating candidates;

---

[3] "Undemocratic and Unsupported: Americans overwhelmingly oppose the Federal government's takeover of Puerto Rico's finances," Data for Progress, Sept. 15, 2021, *available at* https://www.dataforprogress.org/blog/2021/9/15/undemocratic-and-unsupported-americans-overwhelmingly-oppose-the-federal-governments-takeover-of-puerto-ricos-finances    ("In    our survey of Puerto Rico voters in late 2020, we found that an overwhelming majority view the Fiscal Oversight and Management Board (FOMB) unfavorably.").

[4] *See, e.g.*, *Protests Erupt in Puerto Rico Over Control Board Meeting*, WALL STREET JOURNAL, Nov. 21, 2016, *available at* https://www.wsj.com/articles/protests-erupt-in-puerto-rico-over-control-board-meeting-1479735224; *Puerto Ricans Aren't Done Protesting. 'La Junta' is Why*, VICE NEWS, July 25, 2019, *available at* https://www.vice.com/en/article/9kxxxy/puerto-ricans-arent-done-protesting-la-junta-is-why.

- records submitted by Board candidates, "including financial disclosures and documents, conflict of interest forms or information, personal and professional background, interest statement, who they were recommended by and their professional qualifications";

- records reflecting "the process for determining conflicts of interest" and any conflicts of interest Treasury personnel identified for specific candidates;

- records "indicating what information was examined with respect to the professional and personal backgrounds of candidates for the Board, and by whom"; and

- a broad array of communications pertaining to the selection process, including among Treasury personnel, Board candidates, and "any other agency or official of the federal government."

17.    Treasury assigned the request control number 2017-02-121.  On February 9, 2017, Treasury sent plaintiffs a letter acknowledging receipt of the request.  On March 22, 2017, Treasury sent a second letter denying plaintiffs' request for expedited processing.

18.    On March 29, 2017, Treasury's then-Assistant General Counsel for Banking and Finance, Steven Laughton, advised plaintiffs' counsel that the request was unduly broad.  The parties then discussed how to narrow the search.  The parties agreed that Treasury would first conduct a search for correspondence between Treasury employees and the then-current members of the Oversight Board.  Plaintiffs' counsel indicated that they were unwilling to narrow their FOIA request to only that correspondence, but they agreed that, after reviewing the records Treasury identified and produced, they were willing to discuss further narrowing of the request.

19.    Treasury conducted searches for responsive correspondence.  Records were collected and provided to Treasury's Office of Privacy, Transparency, and Records for review and processing.

However, due to the volume of this and other FOIA requests, no records were processed and produced to plaintiffs prior to the commencement of this lawsuit.

20.     Plaintiffs commenced the instant action on or about May 16, 2019, seeking an order directing Treasury to search for, process, and produce all non-exempt records responsive to their FOIA request.

21.     Thereafter, Treasury completed its review and processing of correspondence between Treasury employees and the then-current members of the Oversight Board, as previously discussed with plaintiffs' counsel.  Treasury produced all responsive, non-exempt portions of those records in October 2019 and November 2019.

22.     In subsequent discussions, plaintiffs declined to waive any parts of the remainder of their FOIA request.  Consequently, beginning in April 2020, Treasury conducted searches for additional potentially responsive records.  Treasury then reviewed, processed, and produced responsive records on a monthly basis from September 2020 through December 2021.

23.     Following the Department's completion of productions, the parties met and conferred in an effort to identify and, where possible, resolve plaintiffs' concerns regarding the adequacy of Treasury's search and its application of FOIA's statutory exemptions.  As part of that process, Treasury agreed to re-review a limited set of records plaintiffs identified as being of particular interest.  As a result of that re-review, on June 16, 2022, Treasury reprocessed and produced new copies of the records plaintiffs had identified, releasing certain information that had previously been withheld.

24.     After further discussions, plaintiffs informed Treasury that they continued to challenge certain exemptions applied to 26 records in the June 2022 re-release.  Plaintiffs do not challenge the adequacy of the Department's search.

**The Challenged Records**

25.     Plaintiffs challenge Treasury's application of FOIA's statutory exemptions to parts of 26 records.  The challenged records consist primarily of email correspondence among Treasury employees involved in identifying, evaluating, and recommending candidates for the Oversight Board.  Many of these emails attach charts conveying the names and relevant information of candidates under consideration.  Two records comprise materials created in anticipation of a call to discuss potential candidates and a timeline for the President and Congress to make and unveil their final selections for the Board.  Finally, two emails concern issues immediately preceding the selection of the Board.

26.     **UST_604-605**[5] is an email thread among Treasury and White House personnel dated June 15, 2016, identifying and evaluating certain Board candidates and circulating two draft candidate lists: **UST_606-611** and **UST_612-617**.  The candidate lists identify and rank candidates; summarize and comment on biographical information deemed relevant to their potential service on the Board; and divide potential candidates into those likely to be nominated by Democrats and those likely to be nominated by Republicans.  In some cases, the lists identify who recommended the candidate and indicate whether the candidate has either expressed interest in serving on the Board.  The first list also sets out "presumptive PR candidate scenarios" speculating about which potential candidates might be nominated and who might nominate them.  Together, these records appear at **Exhibit 1**.

---

[5] The Bates numbers as they appear on the challenged records have a string of additional zeroes before the number (to account for the potential volume of records that might ultimately have been produced) and "_R" appended to the end of the number (to indicate that this is record had previously been produced in a different form but was then reprocessed and re-released in June 2022).  So, for example, the Bates stamp on the first page of this first record reads: UST_00000604_R.  To simplify matters for the reader, both this declaration and Treasury's accompanying memorandum of law refer to the records without the extra zeroes and the "_R" suffix.

27.     **UST_620-625 (Exhibit 2)** and **UST_626-631 (Exhibit 3)** are lists of potential Board candidates; they contain the same candidate information as UST_606-611 and UST_612-617.

28.     **UST_1094-1095** is an email thread among Treasury personnel dated July 5, 2016, identifying and commenting on certain Board candidates, one of whom (Ana Matosantos) was ultimately selected.  The email also circulates a draft candidate list titled "Original Candidates for Consideration as Possible Oversight Board Candidates" (**UST_1096-1011**), which identifies potential candidates and summarizes biographical information deemed relevant to the individuals' potential selection for the Board.  Together, these records appear at **Exhibit 4**.

29.     **UST_1183-1194 (Exhibit 5)** is an undated set of meeting materials titled "Puerto Rico Staff Meeting."  It includes a meeting agenda, a draft "Process Timeline" for deciding on and announcing members of the Board, and a document titled "Implementation Workstreams."  The materials also include a chart evaluating potential Board candidates; the chart divides the candidates into tiers and includes the following information for each candidate: "Candidate Name," "Source," "[Puerto Rico] Ties," "Gender," "Expertise," "Conflicts," and "Background."

30.     **UST_1278-1280 (Exhibit 6)** and **UST_1281-1284 (Exhibit 7)** are email threads among Treasury personnel dated July 14 and 15, 2016, discussing candidate José R. González, who was ultimately selected for the Board.  Some of the emails include candid evaluations of Mr. González by Treasury personnel and also offer opinions concerning the Board selection process in general.

31.     **UST_1290-1291** is an email thread among Treasury employees dated July 15, 2016. The bodies of two of the emails consist of a chart titled "Categories of Potential Board Candidates," which lists potential candidates by categories (for example, "Highly Qualified Candidates with some risk" and "Candidates with less political risk but greater chance of not being an effective board member").  The chart also provides biographical information deemed relevant to the listed

candidates' potential service on the Board.  Other emails in the thread identify certain candidates and/or offer candid opinions about which category the candidates should fall into on the chart.  The "Categories of Potential Board Candidates" chart is also included as an attachment at **UST_1292**. Together, these records appear at **Exhibit 8**.

32.     **UST_1293 (Exhibit 9)** is an email between Treasury employees dated July 15, 2016, the body of which consists of a biography of a Board candidate who was not ultimately selected.

33.     **UST_1294-1295 (Exhibit 10)** is an email thread among Treasury employees dated July 14 through 16, 2016, recounting a conversation with a potential Board candidate who was not ultimately selected about his views on PROMESA and his potential willingness to serve on the Board.

34.     **UST_1300-1302** is an email thread among Treasury employees dated July 15 and 18, 2016.  It is a continuation of the email thread at UST_1290-1291 and contains the same "Categories of Potential Board Candidates" chart in the bodies of two emails.  Other emails in the thread identify certain candidates and/or offer candid opinions about which category they should fall into on the chart.  The "Categories of Potential Board Candidates" chart is also included as an attachment at **UST_1303**.  Together, these records appear at **Exhibit 11**.

35.     **UST_1360** is an email thread among Treasury employees dated July 15, 2016, circulating charts (**UST_1361-1365**) providing the names of potential Board candidates and biographical information deemed relevant to their potential service on the Board.  The charts divide potential candidates into "Democratic" and "Republican" candidates.  Together, these records appear at **Exhibit 12**.

36.     **UST_1387-1388** is an email thread among Treasury employees dated August 5, 2016.  The body of one of the emails consists of a potential Board candidate list "floated by [House Speaker Paul] Ryan's staff before Senate passage of" PROMESA.  The email thread also circulates

a series of charts (**UST_1389-1392**) providing further information about potential candidates identified by Speaker Ryan.  The charts group the candidates according to various criteria, e.g., Speaker Ryan's "final list" as of August 4, 2016; his "original" list from May 2016; whether the candidates are from Puerto Rico or elsewhere; and whether they are on the Speaker's "A List" or "B List."  Subsequent charts identify candidates, evaluate them, offer opinions about them, and note biographical information deemed relevant to their potential service on the Board.  Together, these records appear at **Exhibit 13**.

37.     **UST_1415-1416** is an email thread among Treasury employees dated August 22, 2016.  The body of the email contains the names and contact information (email addresses and telephone numbers) for certain "final tentative nominees" for the Board (including some who were ultimately selected and some who were not).  The email also contains biographical information both for candidates who were ultimately appointed to the Board and "backup candidates" who were not.  The email circulates an attachment (**UST_1417-1420**) providing the same information about the same candidates in chart form.  Together, these records appear at **Exhibit 14**.

38.     **UST_2388** is an email thread dated July 6 and 7, 2016, among Treasury and White House personnel.  The emails circulate materials for use during an upcoming conference call to discuss potential members of the Board.  Plaintiffs have stated that they do not challenge the withholding of certain email addresses and contact information on that document, but they do challenge the withholding of parts of the attachments: **UST_2389-2397** provides the names of potential candidates and background information deemed relevant to their potential service on the Board, and it indicates whether additional "follow up" is required to evaluate their candidacy.  It also ranks the candidates by tier, identifies candidates who were previously considered but were not selected, and identifies certain individuals as "Speaker Ryan" candidates.  **UST_2398-2400** consists

of an "Implementation Workstreams" document and a draft "Process Timeline" for deciding on and announcing members of the Board.  Together, these records appear at **Exhibit 15**.

39.    **UST_2795-2798 (Exhibit 16)** is an email thread among Treasury personnel dated August 18 and 19, 2016, discussing draft "Topline Points for Puerto Rico Oversight Board Rollout."

40.    **UST_2862 (Exhibit 17)** is an email dated August 21, 2016, from an Ethics Counsel in the White House Counsel's Office to a Treasury attorney, seeking "Treasury's review and input" on a number of issues, including a "legal and policy question" relating to the appointment of the Board members.

**Applicable Exemptions**

41.    As described above, following the completion of Treasury's search for, processing, and production of responsive records, the parties met and conferred in an effort to identify and, where possible, resolve outstanding disputes.  As part of that process, Treasury re-reviewed certain documents plaintiffs identified as being of particular interest and released material that was previously withheld.  Treasury has not asserted FOIA exemptions in every case where it reasonably believes exemptions could apply.  Rather, Treasury has only withheld material that it believes lies at the heart of FOIA's exemptions.  To that end, Treasury has asserted Exemption 5 to protect the portions of the challenged records that contain core deliberations about potential Oversight Board members and the process for their appointment; presidential communications about which candidates the President should appoint to the Oversight Board and how to implement that process; and an attorney-client communication between a White House lawyer and a Treasury lawyer.  Treasury has also asserted Exemption 6 over portions of the challenged records whose release would constitute an unwarranted invasion of personal privacy, either because they would subject individuals who were considered for appointment to the Oversight Board to potential embarrassment

or reputational harm, or because they would identify lower-level Treasury employees and subject them to public exposure and controversy while disclosing little about the agency's activities.

**Exemption 5**

42.    Exemption 5 of the FOIA exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption encompasses the types of protections ordinarily available in civil discovery.  Treasury has asserted Exemption 5 to withhold portions of the challenged records based on the deliberative process privilege, the presidential communications privilege, and the attorney-client privilege.

43.    Treasury applied Exemption 5 solely to internal or intragovernmental communications—that is, to communications among Treasury employees or between Treasury and the White House.  None of these communications were with third parties outside of the federal government.

Deliberative Process Privilege

44.    The deliberative process privilege is intended to protect the decision-making processes of the Executive Branch from public scrutiny in order to enhance the quality of Executive Branch decisions.  To be protected by the deliberative process privilege, the information at issue must be both "pre-decisional" and "deliberative."

45.    Treasury asserted the deliberative process privilege to protect the portions of the challenged records that contain core deliberations about potential Oversight Board members and the process for their appointment.  All but three of the challenged records (UST_1360, UST_2795-2798, and UST_2862) contain material withheld pursuant to this privilege.

46.    The challenged portions are "pre-decisional" because they were created before the decision at issue.  Most of the challenged portions consist of candid discussions and evaluations of

potential Oversight Board members.  They were created prior to the President's decision about whom to select for the Oversight Board.  These documents were created to assist the final decisionmakers – Congressional leadership and, ultimately, the President – in determining whom to appoint.  As such, the challenged records did not constitute the government's final position concerning either appointments to the Board or the process by which appointments would be made, and they do not embody any final Executive Branch action.

47.    The withheld parts of the challenged records are also deliberative.  They reflect the subjective views of individual, mid-level Treasury employees about the qualifications and relative merits of numerous potential Board members—including those employees' opinions about the extent to which the candidates' backgrounds, political views, personalities, and other attributes might make them successful or unsuccessful Board members.  The challenged records were created as part of a broader consultative process by which Treasury helped to identify, evaluate, and vet potential appointees.  The records do not reflect the final views of the agency, nor do they necessarily reflect the reasoning behind the President's decisions regarding which candidates to appoint (and which candidates not to appoint).

48.    Treasury personnel prepared the challenged records to succinctly summarize significant issues and present key background information regarding potential candidates for further internal discussion and, ultimately, presentation to decisionmakers.  In doing so, Treasury employees distilled both pertinent publicly available information about the candidates and information obtained from the candidates themselves.  Throughout the process, Treasury employees assessed the available information compiled about each candidate and selected the most important information for inclusion in their assessments and rankings.  Thus, the decision to include or exclude certain information gathered during the course of Treasury's consideration of the potential candidates was itself an inherent part of the deliberative process.

49.     Evaluating candidates for potential appointment demands the robust exchange of opinions and ideas, so that government officials may feel free to debate, laud, or denigrate potential appointees without fear that their words will later be made public.  Release of the withheld portions of these documents would have a chilling effect on the free exchange of opinions and ideas by Treasury officials and staff involved in future efforts to identify candidates for future appointments. If Treasury officials and staff believe that such exchanges could become public, they are unlikely to feel at liberty to offer their candid opinions.  This is particularly true where, as here, the individuals being discussed are highly qualified leaders in their respective fields, and Treasury officials may encounter them in a professional capacity at points in the future.  In such circumstances, Treasury officials and staff will be unlikely to candidly state, for example, reasons that a certain candidate should not be selected, or to assign candidates to "Tier 1" or "Tier 2" rankings.  The reluctance of Treasury officials and staff to share their candid opinions, and the bases for them, would restrict Treasury's ability to advise decisionmakers on candidates for appointment to important governmental positions.  This would adversely affect Treasury's ability to assist decisionmakers, including the President, in appointing individuals that best represent the interests of the U.S. government and U.S. taxpayers.

50.     Furthermore, certain portions of the withheld materials reflect information provided by candidates to Treasury staff during vetting interviews.  In a vetting interview, candor is of critical importance, as the government employee asking the questions is seeking to understand both non-public views held by the candidate as well as non-public information that could be embarrassing or harmful if it later became public.  If candidates for government office believe that statements in vetting interviews could later become public under FOIA, they are unlikely to feel at liberty to respond candidly.  The information provided by candidates in vetting interviews is critical to Treasury's deliberations, as the information can bear upon issues such as the candidate's fitness for

the role, their ability to obtain Senate confirmation (if the position requires advice and consent of the Senate), or the actions the candidate might take following appointment. The reluctance of candidates to respond candidly to questions in a vetting interview would deprive Treasury of valuable information necessary to its deliberations. This would adversely affect Treasury's ability to assist decisionmakers in selecting and appointing individuals that best represent the interests of the U.S. government and U.S. taxpayers.

51.     In addition, because these documents represent the internal deliberations of Treasury officials and staff prior to the President's selection of members of the Board, disclosure of the views or opinions of individual Treasury officials and staff could imply assumptions about why certain candidates were selected (or not selected) that may not have been the rationales for final decisions. The Presidential appointment process is iterative. The President may not have considered the preliminary opinions and analyses contained in these documents in making any of the selections, and the ultimate rationale for his decisions might not have been consistent with the views expressed in these pre-decisional documents.

52.     Certain challenged records also contain discussions about how the process for selecting and appointing candidates should unfold. The discussions in these documents took place before a final process for candidate selection was decided on and implemented. They reflect proposals from Treasury or White House personnel about what steps should be taken prior to appointing Oversight Board members. These proposals were exchanged as Treasury and the White House staff deliberated over what other parties should be consulted on the selections, and on what timeframe. These records are deliberative because they might not reflect the actual process that was followed. Their release would be harmful, because it would create confusion about whether the government followed the process points that were outlined. In addition, if the government did not, in fact, consult with individuals that certain mid-level Treasury or White House employees

17

suggested should be consulted, that could undermine Treasury's ongoing relationships with those individuals.

Attorney-Client Privilege

53.     The attorney-client privilege concerns confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice. The privilege applies to facts divulged by a client to their attorney, but also encompasses any opinions given by an attorney to his client based upon, and thus reflecting those facts, as well as communications between attorneys that reflect client-supplied information.  The privilege also encompasses requests for legal advice from clients to attorneys.

54.     Treasury has withheld part of one record (UST_2862) based on the attorney-client privilege.  In that portion, a White House Ethics Counsel asks Treasury's Assistant General Counsel (General Law, Ethics, and Regulation) for Treasury's position on a "legal and policy question."

55.     This is covered by the attorney-client privilege because it consists of a question from a White House attorney to a Treasury attorney about what the law requires on a particular issue related to ethics and the Oversight Board.  Treasury attorneys often provide legal advice to the White House on issues within Treasury's particular expertise.  If White House counsel's request for legal advice were ordered disclosed, it would harm interests protected by Exemption 5 by discouraging clients from soliciting legal advice, which in turn would harm the ability of agency counsel to provide the best possible legal representation.

Presidential Communications Privilege

56.     The presidential communications privilege protects confidential communications that relate to potential presidential decision-making, and that involve the President or his senior advisors.  The privilege protects communications in connection with the President's performance of the responsibilities of his office and made in the process of shaping policies and making decisions.

It does so because protecting the frank and candid deliberations of ideas and expression of views is essential to ensure that Executive Branch officials and advisors are able to thoroughly examine issues, formulate opinions, and provide appropriate advice to the President.  Accordingly, the privilege applies to documents in their entirety, and covers final and post-decisional materials as well as pre-decisional documents.

57.    Two of the records which Treasury has withheld pursuant to Exemption 5 and the presidential communications privilege (UST_2389-97 and UST_2398-2400) are communications between Treasury officials and staff and a senior advisor to the President—the Deputy Assistant to the President and Deputy Director of the National Economic Council, Jason Miller—as well as other White House staff working for senior presidential advisors as part of the process of shaping presidential decision-making.  Specifically, these records form part of the process of advising the President in connection with his statutory obligation to appoint members of the Oversight Board.  Treasury's assertion of the presidential communications privilege over these records is coextensive with its assertion of the deliberative process privilege.

58.    Appointing individuals to serve is a core presidential responsibility.   The withheld portions of UST_2389-97 contain frank assessments of the relative strengths of candidates for the Oversight Board, including grouping candidates into "Tier 1," "Tier 2," "Additional Candidates," and "Other Candidates Considered But Not Selected."  These assessments were created by Treasury personnel and disseminated to a senior presidential advisor and White House staff in anticipation of a call to discuss the appointments process.  They contain precisely the types of frank and candid deliberations and expressions of opinions that the presidential communications privilege protects.

59.    The withheld portions of UST_2398-2400 contain discussions about how the process for selecting and appointing candidates should unfold.   This record was also created and disseminated to Mr. Miller and others in anticipation of the call between Treasury and White House

personnel.  The record identifies steps that Treasury and White House officials were considering whether to take as the lists of candidates were finalized, and a proposed timeline for completing the appointments process.  It also raises the possible need for outreach to stakeholders.

60.     Disclosing these materials would chill the ability of the White House to solicit candid opinions from other Executive Branch agencies regarding the appointment of government officials. The Treasury personnel involved in creating these records would have reasonably expected that their opinions and recommendations regarding the appointment of Board members would remain confidential.  The White House is not, itself, subject to the Freedom of Information Act.  In certain circumstances, senior presidential advisors within the White House may solicit the expertise of Executive Branch agencies that are subject to FOIA in evaluating candidates for the President to appoint.  But if such communications—including frank assessments of the strengths and weaknesses of potential candidates—may later become public, the President and his advisors may be less likely to seek out and obtain this candid advice.  This would deprive the President of the expertise and insights held by other Executive Branch employees.  Disclosing records like UST_2398-4000 might also create confusion about whether the government followed a proposed process, and would therefore inhibit senior presidential advisors from communicating to Executive Branch agencies about processes that are under consideration but not finalized.  Accordingly, release of these records would infringe on the free and candid exchange of opinions and recommendations designed to advise the President.

61.     The third record over which Treasury has asserted the presidential communications privilege, UST_2862, consists of a question from White House Ethics Counsel to Treasury's Assistant General Counsel (General Law, Ethics, and Regulation) for Treasury's position on a "legal and policy question."  As explained above, the withheld portion of this record is also withheld pursuant to the attorney-client privilege.  Understanding the legal and policy position of an agency

is central to the President's ability to faithfully execute the laws.  Disclosing this record would adversely affect the willingness of White House attorneys to solicit the positions of Executive Branch agencies on legal or policy questions, which would impair the President's decision-making ability.

**Exemption 6**

62.     Exemption 6 of the FOIA protects information about individuals in personnel and medical files and similar files when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The "similar files" language of the exemption should be broadly construed.  Determining whether an invasion of personal privacy is "clearly unwarranted" requires a balancing between the public's interest in knowing "what the government is up to" against the personal privacy interests of the parties at issue.

63.     Treasury has withheld three types of information pursuant to Exemption 6.  First, the Department withheld information about Oversight Board candidates who were not selected by the President, including their names, biographies, and other background information.  Second, the Department withheld Treasury and White House personnel's candid opinions and assessments of the relative strengths and weaknesses of Oversight Board candidates, including those who were ultimately appointed to the Board.  Third, the Department withheld the names of low-level Treasury employees or detailees whose names appear on certain records, but who did not play a substantive role in the consultative process.[6]

64.     The names, biographies, and other background information of Oversight Board candidates who were not selected by the President is properly withheld under Exemption 6.  The withheld information is similar to information that would be found in a personnel file, and its

---

[6] Treasury also withheld various telephone numbers appearing in the records, as well as the email addresses (but not the names) of White House employees.  Plaintiffs do not challenge those redactions.

21

disclosure would constitute a clearly unwarranted invasion of personal privacy.  Because over one hundred potential candidates were identified through soliciting input from internal and external stakeholders, it is likely that some or even many of these candidates never knew (and still do not know) that they were under consideration.  Disclosure of the withheld information would therefore harm the privacy interests of candidates who were not selected in two ways.  First, disclosure that an individual was considered but ultimately not appointed might cause embarrassment or reputational harm, which is even more acute where some candidates may not even have known they were under consideration.  Second, given the unpopularity of the Oversight Board in Puerto Rico, public disclosure that an individual was under consideration could likewise cause embarrassment or reputational harm.  These substantial privacy interests outweigh whatever interest the public might have in the names and other personal identifying information of individuals who were considered (at times without their knowledge), but were not selected, for positions on the Board.

65.     Treasury also properly withheld Treasury and White House staff's assessments of the relative strengths and weaknesses of various candidates, including both candidates who were not selected as well as those who were selected.  This information is similar to what might be found in a personnel file insofar as is akin to performance evaluations or other types of candid employee evaluations.  Public disclosure of that information—for example, revealing that a candidate was not considered a "Tier 1" or a "Tier 2" candidate, or that they were viewed (at least by certain personnel) as being a politically risky appointment—could cause harm to that person's privacy interests through embarrassment or reputational harm. Similarly, the candid assessments withheld from these records sometimes include discussion of private information revealed by candidates during vetting interviews, including financial information, that could cause reputational or other harms.  Again, even if the public has some interest in the internal assessments of Treasury and White House staff

about the potential strengths and weaknesses of the candidates, that interest would be outweighed by the substantial privacy interests of the individuals.

66.     Finally, the names of lower-level Treasury employees or detailees who did not play a substantive role in the consultative process are also protected by Exemption 6.  It is Treasury's general policy not to disclose the names of employees below the Senior Executive Service ("SES") level, as those individuals do not set policy for the agency, and thus there is not any public interest in revealing the identity of the employees that outweighs their privacy interests.  In the challenged documents, however, Treasury has disclosed the names of many non-SES employees, so as to provide plaintiffs with a full picture of the individuals who were most involved in this process.  The only names Treasury has withheld are those of lower-level employees who did not play a policymaking role, such as administrative assistants copied on drafts of documents to print (UST_1293, UST_1360) or a detailee providing line edits and comments on a draft Q&A (UST_2795-98).  While the public might have an interest in knowing the identity of the high- and mid-level Treasury personnel who participated substantively in identifying and evaluating potential Board candidates, it has only a minimal interest at best in the withheld names of lower-level individuals who played more ministerial roles in that process.  That is particularly true given the controversy surrounding the Oversight Board; disclosing the names of lower-level employees who were not involved substantively in discussions of potential Board candidates might nonetheless subject them to embarrassment or harassment.  In the case of these lower-level employees, there is insufficient public interest in their names to justify the intrusion into their privacy.

*

67.     I declare under penalty of perjury that the matters set forth in this Declaration are true and correct to the best of my knowledge, information, and belief.

Executed this 5th day of June, 2023

Michelle A. Dickerman
Digitally signed by Michelle A. Dickerman
Date: 2023.06.05 19:03:16 -04'00'

_____

Michelle A. Dickerman
Deputy Assistant General Counsel for Litigation,
       Oversight, and Financial Stability
Office of the General Counsel
U.S. Department of the Treasury