UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――
LATINOJUSTICE PRLDEF, *et al.*,
                              Plaintiffs,

  -v-

DEPARTMENT OF THE TREASURY,
                              Defendant.
―――――――――――――――――――――――――――――――

19-CV-4417 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs LatinoJustice PRLDEF, Center for Constitutional Rights, and Centro de Periodismo Investigativo (CPI) (collectively, "Plaintiffs") bring this action against Defendant the Department of the Treasury ("Treasury") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). Plaintiffs seek records relating to then-President Barack Obama's 2016 appointment of individuals to serve on the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "Board"). The parties have cross-moved for summary judgment on the question whether Treasury has properly exempted parts of twenty-six records under FOIA Exemptions 5 and 6, 5 U.S.C. § 552(b)(5)-(6). For the reasons that follow, Treasury's motion is granted and Plaintiffs' motion is denied.

I.     Background

  A.     Factual Background

In response to Puerto Rico's fiscal crisis, on June 30, 2016, President Obama signed into law the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("PROMESA"), 48 U.S.C. §§ 2101 *et seq*. (ECF No. 83 ("Dickerman Decl.") ¶ 3.) Among other provisions, PROMESA created an Oversight Board "within the territorial government" of Puerto Rico. 48 U.S.C. § 2121(c)(1). The purpose of the Board was "to provide a method for a

1

covered territory to achieve fiscal responsibility and access to the capital markets." *Id.* § 2121(a). PROMESA vests the Board with extensive authority over Puerto Rico's fiscal matters. (Dickerman Decl. ¶ 4; ECF No. 88 ("Valentin Ortiz Decl.") ¶ 14.)

Under PROMESA, the President was charged with appointing seven members to the Oversight Board according to the following formula: two members would be selected from two, non-overlapping lists submitted by the Speaker of the House of Representatives; two members would be selected from a list submitted by the Majority Leader of the Senate; one member would be selected from a list submitted by the Minority Leader of the House of Representatives; one member would be selected from a list submitted by the Minority Leader of the Senate; and one member would be selected in the sole discretion of the President. *See* 48 U.S.C. § 2121(e)(2)(A)). Senate confirmation of the Board members was not required under this appointment process. *Id.* § 2121(e)(2)(E)). Board members are required to have "knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government," *id.* § 2121(f)(1), and Puerto Rico public officers, candidates for elected office, and former elected officials are ineligible to serve on the Board. *Id.* § 2121(f)(2).

Treasury had been "deeply involved in drafting PROMESA" and so Treasury "also played a central role in identifying and evaluating potential candidates for the Oversight Board," including through soliciting input from "members of Congress and other interested parties." (Dickerman Decl. ¶ 7.) Over the course of the selection process, "Treasury identified and considered more than 115 potential candidates for the Oversight Board." (*Id.*) While it was ultimately up to Congressional leaders to decide which candidates to include on their lists, and up to the President to decide whom to appoint to the Board in his sole discretion and whom to

select from the Congressional lists, Treasury employees communicated with leadership in both political parties and the White House to evaluate candidates and make recommendations. (*Id.*) Numerous Treasury employees were involved in this process, including the Counselor to the Secretary of the Treasury, the Director of Treasury's Office of State and Local Finance, and personnel within Treasury's Office of Domestic Finance and Office of the General Counsel. (*Id.* at ¶ 8.)

Throughout the selection process, "Treasury employees debated the relative merits of different candidates, ranked candidates by order of preference (such as listing some candidates as 'First Tier,' 'Second Tier,' etc.), and discussed which candidates would potentially work well together." (*Id.* at ¶ 9.) The lists of potential candidates evolved over time and took numerous forms. For example, some of the lists are titled "Highly-Qualified Candidates on a Congressional List," "Highly-Qualified Candidates with some risk," "Highly-Qualified Candidates with conflicts that would require a Presidential waiver to adequately serve," and "Candidates with less political risk but greater chance of not being an effective board member (e.g. persuasive with other Board members)." (*Id.* at ¶ 10.)

As part of the selection process, Treasury employees conducted vetting interviews in which they asked candidates about their backgrounds, views on Puerto Rico's fiscal crisis, and potential conflicts of interest, and then produced written evaluations of the candidates. (*Id.* ¶ 11.) Treasury employees then used this information to advise the Secretary of the Treasury about their assessments of potential candidates, provided their evaluations to White House personnel, and communicated with Congressional leadership to advise whether candidates should be included on the final lists of candidates. (*Id.* ¶ 11.) White House counsel also conferred with Treasury attorneys about legal and ethics issues. (*Id.* ¶ 12.)

Near the conclusion of the selection process, Treasury employees and White House staff deliberated over a timeline for consulting with congressional leaders on their lists of candidates, vetting candidates and conducting ethics reviews, and finalizing appointments.  (*Id.* ¶ 13.) Treasury employees and White House staff also consulted with one another to draft talking points and press releases in anticipation of the appointments.  (*Id.*)  On August 31, 2016, President Obama appointed the seven original members of the Oversight Board.  (*Id.* ¶ 14.)

There was extensive "public discussion and lobbying efforts" regarding PROMESA from the moment the legislation was introduced.  (Valentin Ortiz Decl. ¶ 11.)  "Politicians in San Juan and Washington, D.C. opposed PROMESA because of the undemocratic and colonial nature of the Board, whose members would not be elected by Puerto Rico voters."  (*Id.*)  In addition, "[l]abor unions and civil organizations raised flags over the negative effects the Board's actions would have on Puerto Rico residents, including spending cuts to public services and pensions, as well as reductions in-work benefits."  (*Id.*)  Opposition also came from "Puerto Rico creditor groups and conservative organizations," which called PROMESA "a bailout of Puerto Rico at the expense of U.S. taxpayers, that would also undermine creditor rights and the U.S. municipal bond market."  (*Id.*)  The appointment of the Board was met with "calls for civil disobedience and boycotts" and "[m]ore recent public opinion polling has shown that the Oversight Board remains profoundly unpopular in Puerto Rico."  (Dickerman Decl. ¶ 15.)

CPI is a non-profit media organization focused on government transparency in Puerto Rico.  (Valentin Ortiz Decl. ¶ 2.)  For the past six years, CPI has engaged in public records litigation "to oversee and shed light" on the Board's actions.  (*Id.* ¶ 31.)  As part of that effort, CPI, alongside LatinoJustice PRLDEF and the Center for Constitutional Rights, submitted the FOIA request on January 27, 2017, which led to the present lawsuit.  (*Id.*)  The challenged

records contain information regarding candidates who were considered for appointment to the Board. (Dickerman Decl. ¶ 12.) CPI seeks these records because "there were and still are: (1) public concerns about the lack of transparency and accountability during the Board's selection, vetting, and appointment process of candidates; (2) questions raised about the institutional affiliations, backgrounds and possible conflicts of interest as to potential and current Board members, and (3) the lack of meaningful public participation and poor oversight of the Board's operations, actions and policies." (Valentin Ortiz Decl. ¶ 32.) CPI further represents that "these concerns also extend to the fact that there will continue to be new and renewed Board members' appointments and the people of Puerto Rico will remain in the dark about the selection process and identities of candidates for the most powerful government entity in Puerto Rico today." (*Id.*)

### B. Procedural History

On or about January 27, 2017, Treasury received a FOIA request from Plaintiffs seeking "all records relating to the Oversight Board, including, but not limited to, records relating to the seven individuals originally appointed to the Board. The request further sought an additional 15 categories of records pertaining to the selection of the Oversight Board." (Dickerman Decl. ¶ 16.) Treasury conducted searches for responsive correspondence but did not process or produce any records to Plaintiffs prior to the commencement of this action. (*Id.* ¶ 19.) Plaintiffs commenced the instant action on or about May 16, 2019, seeking an order directing Treasury to search for, process, and produce all non-exempt records responsive to their FOIA request. (*Id.* ¶ 20; ECF No. 1.) Thereafter, Treasury continued to conduct searches and review, process, and produce responsive records to Plaintiffs. (Dickerman Decl. ¶¶ 21-22.) Upon Treasury's completion of production, the parties met and conferred in an effort to resolve Plaintiffs' concerns regarding the adequacy of Treasury's search and its application of FOIA's statutory exemptions. (*Id.* ¶ 23.) Treasury agreed to re-review a set of records that were of particular

interest to Plaintiffs, and as a result, reprocessed and produced new copies of the records releasing certain additional information. (*Id.*) After further discussions, Plaintiffs continued to challenge certain exemptions applied to 26 records in the re-release. (*Id.* ¶ 24.) Plaintiffs do not challenge the adequacy of Treasury's search. (*Id.*)

Treasury filed its motion for summary judgment on June 5, 2023. (ECF No. 81.) Plaintiffs filed their cross-motion for summary judgment on July 24, 2023. (ECF No. 86.) Treasury filed its opposition to Plaintiffs' motion and in further support of its motion on August 23, 2023. (ECF No. 89.) Plaintiffs filed their reply on September 11, 2023. (ECF No. 91.)

## II.     Legal Standard

### A.     Summary Judgment

"Summary judgment is the procedural vehicle by which most FOIA actions are resolved." *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). A moving party is entitled to summary judgment if it can "show[] that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). When there are cross-motions for summary judgment, "each party's motion must be examined on its own merits, and

in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

    **B.**    **FOIA**

The FOIA statute "reflects 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" *Seife v. United States Food & Drug Admin.*, 43 F.4th 231, 234 (2d Cir. 2022) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976)). Therefore, "upon request, FOIA mandates disclosure of records held by a federal agency . . . unless the documents fall within enumerated exemptions." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001). "[D]isclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force*, 425 U.S. at 361. The exemptions, then, are given a "narrow compass." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989).

"An agency withholding documents responsive to a FOIA request bears the burden of proving the applicability of claimed exemptions." *ACLU v. Dep't of Just.*, 681 F.3d 61, 69 (2d Cir. 2012) (citation omitted). "Affidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Id.* (citation omitted). That being said, "[a]ll doubts are resolved in favor of disclosure." *Seife*, 43 F.4th at 235 (quoting *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010)).

In a FOIA case, summary judgment is appropriate when the agency's declarations "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith. Thus, the agency's

justification is sufficient if it appears logical and plausible." *ACLU v. United States Dep't of Def.*, 901 F.3d 125, 133 (2d Cir. 2018), as amended (Aug. 22, 2018) (internal citations omitted).

In 2016, Congress passed the FOIA Improvement Act ("FIA") "out of concern that some agencies [were] overusing FOIA exemptions." *Seife*, 43 F.4th at 235 (citation omitted). Under the FIA, an agency is permitted to withhold information only if it falls within a FOIA exemption and at least one of two additional requirements is met. The requirements are that:

(I)  the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or

(II) disclosure is prohibited by law.

5 U.S.C. § 552(a)(8)(A)(i)(I)-(II). The Second Circuit has described the FIA as imposing "an additional, independent burden on the agency." *Seife*, 43 F.4th at 235.

Finally, the FOIA statute mandates that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). "This provision requires agencies and courts to differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes." *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 629 (S.D.N.Y. 2018) (internal citation omitted).

**III. Discussion**

    **A.  The Adequacy of Treasury's Declaration**

As a threshold matter, Plaintiffs contend that Treasury has failed to provide a reasonably specific justification for its invocation of exemptions because Treasury's first Dickerman Declaration "gives sweeping justifications for withholding records, without correlating to the records or particular parts of them." (ECF No. 87 at 7.) Plaintiffs therefore request that the Court deny Treasury's motion on these grounds or, "in the alternative, order Treasury to produce

8

a proper *Vaughn* index and/or supplement their declarations containing a document-by-document or page-by-page description of the withheld materials." (*Id.* at 8.)

As discussed above, "[a]ffidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *ACLU v. Dep't of Just.*, 681 F.3d at 69 (citation omitted). The First Dickerman Declaration describes each individual challenged record, identified according to Bates number, and includes information about the nature of the record (e.g., email, chart, attachment, etc.), the date or date range of the record (if any), the senders and recipients of the record, and the content of the exempted and non-exempted material. (Dickerman Decl. ¶¶ 25-40.) The Dickerman Declaration also appends the challenged records themselves. (ECF Nos. 83-1 to 83-17.) The non-exempt material in the records provides ample context to understand the nature of the content of the exempted material. In each record, Treasury clearly marks the exempted material, and clearly identifies the relevant exemption or exemptions. The Dickerman Declaration also discusses in detail the legal basis for exempting such material under the relevant exemption or exemptions. (Dickerman Decl. ¶¶ 41-66.)

Finally, that Treasury submitted an affidavit in lieu of a *Vaughn* index is a nonissue. "Agency affidavits sometimes take the form of a '*Vaughn* index,' but there is 'no fixed rule' establishing what such an affidavit must look like." *New York Times Co. v. U.S. Dep't of Justice*, 758 F.3d 436, 439 (2d Cir. 2014) (quoting *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014). "The materials provided by the agency may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege." *Id.* (quoting *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 128 (D.C.Cir.1987)). For the reasons explained above, the Court concludes that Treasury's first

Dickerman Declaration provides reasonably detailed explanations why any withheld material falls within an exemption. It is thus sufficient to sustain the agency's burden.

### B. Treasury's Invocation of Exemption 5

Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). "Exemption 5 incorporates the privileges available to Government agencies in civil litigation, such as the deliberative process privilege, attorney-client privilege, and attorney work-product privilege." *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021).

Almost all of Treasury's withholdings are made under the deliberative process privilege.[1] "To protect agencies from being 'forced to operate in a fishbowl,' the deliberative process privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *United States Fish & Wildlife Serv.*, 592 U.S. at 267 (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). "The privilege is rooted in 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news.'" *Id.* (citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001)). "To encourage candor, which improves agency decisionmaking, the privilege blunts the chilling effect that accompanies the prospect of disclosure." *Id.*

---

[1] All but three of the challenged records (UST_1360, UST_2795-98, and UST_2862) are withheld in part pursuant to the deliberative process privilege.

To fall within the deliberative process privilege, an agency record "must be both 'predecisional' and 'deliberative.'" *Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (citations omitted); *see also Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184 (1975).  The privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Tigue v. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002) (internal citation and quotation marks omitted).

A document is predecisional when it "precedes, in temporal sequence, the decision to which it relates" and when it is 'prepared in order to assist an agency decisionmaker in arriving at [the] decision.'" *Grand Central Partnership, Inc.*, 166 F.3d at 482 (internal citations and quotation marks omitted.)  Here, the relevant decision is President Obama's appointment of the seven original members of the Oversight Board on August 31, 2016.  Plaintiffs concede that most of the materials are predecisional insofar as they were created prior to President Obama's appointment of the members of the Board.  However, Plaintiffs contend that one record, UST_1415-1420, is not predecisional because that record is "Treasury decisionmakers' final selection of candidates, and this determination is not affected by whether subsequently a final decision was made."  (ECF No. 83 at 19 n.7 (citing *People for the Am. Way Found v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 298 (D.D.C. 2007)).)  The Court disagrees.  Because Treasury lacked any authority to take final agency action itself in appointing the Board members, Treasury's recommendations are necessarily predecisional.  *See Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 85 (2d Cir. 1991).

"A document is 'deliberative' when it is actually . . . related to the process by which policies are formulated." *Grand Central Partnership, Inc.*, 166 F.3d at 482 (citing *Hopkins*, 929

F.2d at 84). "A predecisional document will qualify as deliberative provided it . . . formed an essential link in a specified consultative process, . . . reflects the personal opinions of the writer rather than the policy of the agency, and . . . if released, would inaccurately reflect or prematurely disclose the views of the agency." *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 697 F.3d 184, 202 (2d Cir. 2012) (internal citation and quotation marks omitted).

The deliberative process privilege "does not, as a general matter, extend to purely factual material." *Hopkins*, 929 F.2d at 85. However, "it does protect factual material that is 'inextricably intertwined with policy making recommendations so that [its] disclosure would compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5.'" *Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, 560 F. Supp. 3d 810, 835 (S.D.N.Y. 2021) (citing *Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.*, 610 F.2d 70, 85 (2d Cir. 1979)). Purely factual material usually cannot be withheld under the deliberative process privilege "unless it reflects an exercise of discretion and judgment calls." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (internal citation and quotation marks omitted). "[T]he legitimacy of withholding [such material] does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Id.*

Plaintiffs contend that the lists of names of unselected candidates are "purely factual and do not reflect the give and take of the consultative process that Exemption 5 protects." (ECF No. 87 at 19.) Plaintiffs further contend that the summaries of unselected candidates' biographical information are also purely factual and are nothing more than a reorganization and a repackaging

12

of "a mass of dispersed public information." (*Id.* (citing *Petroleum Info. Corp. v. United States Dep't of the Interior*, 976 F.2d 1429, 1438 (D.C. Cir. 1992)).)

The materials containing the candidates' names and Treasury personnel's communications debating the relative merits of the candidates, ranking candidates by order of preference, and discussing which candidates would potentially work well together, are clearly deliberative.  Treasury was tasked with identifying and evaluating potential candidates and advising the President in appointing members to the Board.  The records contain the subjective views of individual Treasury employees about the potential candidates, which formed part of a consultative process by which subordinates formulated recommendations for the President.  The records do not reflect the final view of the President, who was tasked with rendering the final decision.  The candidates' names and Treasury personnel's subjective views on the candidates are thus at the heart of Treasury's deliberative process and are properly withheld under Exemption 5.

Plaintiffs cite cases in which courts have held that lists of names were purely factual, and thus could not be withheld under the deliberative process privilege.  (ECF No. 87 at 19.)  Those cases are readily distinguishable, as they all involved situations "in which names . . . neither reflect[ed] an 'exercise of judgment,' . . . nor involve[d] the selection of facts as part of the agency's deliberative process." *White Coat Waste Project v. United States Dep't of Veterans Affs.*, 443 F. Supp. 3d 176, 189 (D.D.C. 2020).  Here, by contrast, the candidate names are at the heart of the agency deliberation.  The inclusion of a name reveals that a particular individual was considered as a potential candidate for the Board, and thus clearly reflects an exercise of judgment as part of the deliberative process.

The candidates' biographical information is also properly withheld under Exemption 5. As a threshold matter, Plaintiffs' contention that these summaries "simply reorganize[d] and repackage[d] a mass of dispersed public information," is inaccurate. Treasury proffers that the challenged records "distilled both pertinent publicly available information about the candidates and information obtained from the candidates themselves," and Treasury personnel who created these records "assessed the available information compiled about each candidate and selected the most important information for inclusion in their assessments and rankings." (Dickerman Decl. ¶ 48.) This biographical information is also at the heart of Treasury's deliberations, as it goes to the relative merits and qualifications of the candidates. The biographical information that Treasury personnel chose to include reveals what those personnel considered to be relevant to candidates' effectiveness on the Board. It is thus clear that the "selection [and] organization of facts [was] part of an agency's deliberative process." *Ancient Coin Collectors Guild*, 641 F.3d at 513.

Moreover, the candidates' biographical information is "inextricably intertwined with policy making recommendations so that [its] disclosure would compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5." *Knight First Amend. Inst. at Columbia Univ.*, 560 F. Supp. 3d at 835 (citing *Lead Indus. Ass'n, Inc.*, 610 F.2d at 85). Here, where the biographical information is highly detailed, releasing that biographical information would be nearly equivalent to releasing the candidates' names themselves, as it seems likely that one could deduce the candidates' names based on their biographical information.[2]

---

[2] For example, consider the biographical information for Professor David A. Skeel, which is not withheld because Skeel was ultimately appointed to the Oversight Board:

Treasury has also withheld materials in two records relating to the proposed process for selecting and appointing candidates. The first document, UST_1183-1194, is an undated set of meeting materials titled "Puerto Rico Staff Meeting," which includes a meeting agenda, a draft "Process Timeline" for deciding on and announcing members of the Board, and a document titled "Implementation Workstreams." (Dickerman Decl. ¶ 29; ECF No. 83-5.) The second document, UST_2398-2400, consists of an "Implementation Workstreams" document and a draft "Process Timeline" for deciding on and announcing members of the Board. (Dickerman Decl. ¶ 38; ECF No. 83-15.) Plaintiffs contend that these materials cannot be withheld on the basis that implementation timelines are not protected under the deliberative process privilege. (ECF No. 87 at 21 n.10.) While it is true that timelines mapping out the implementation or rollout of already finalized policies cannot be withheld under the deliberative process privilege, here, where the timelines are proposing steps for rendering a final agency action, the timelines may be

---

> David A. Skeel is the S. Samuel Arsht Professor of Corporate Law at University of Pennsylvania Law School, a position he has held since 2004. Mr. Skeel joined University of Pennsylvania Law School in 1999, serving as a Professor of Law until 2003. From 1993 to 1998, Mr. Skeel served as an Associate Professor at Temple University School of Law and as an Assistant Professor from 1990 to 1993. From 1988 to 1990, he was an associate in the law firm Duane, Morris, and Heckscher's Reorganization and Finance Department. He clerked for the Honorable Walter K. Stapleton of the United States Court of Appeals for the Third Circuit. Mr. Skeet received a B.A. from the University of North Carolina at Chapel Hill and a J.D. from the University of Virginia School of Law.

(ECF No 83-14 at 5.) The summary includes various specific positions Skeel held over the course of his career. Moreover, given the nature of the positions Skeel has held, at least some of this information is likely available through an Internet search. And indeed, Treasury acknowledges that some of the information contained in these summaries was obtained from publicly available sources. Given the level of specificity provided, releasing this type of biographical information for the candidates would make it possible for one to determine the identities of the candidates.

withheld under the privilege. *Nat'l Day Laborer Org. Network v. United States Immigr. & Customs Enf't*, 486 F. Supp. 3d 669, 710, 691 (S.D.N.Y. 2020) ("[M]aterials related to the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy, are not subject to the privilege.") (collecting cases).

Finally, Plaintiffs also challenge Treasury's articulation of the foreseeable harms that would arise from disclosure of the material, as required under the FIA, 5 U.S.C. § 552(a)(8)(A)(i)(I).  (ECF No. 87 at 22-23.)  Treasury explains that releasing this information "would have a chilling effect on the free exchange of opinions and ideas by Treasury officials and staff involved in future efforts to identify candidates for future appointments" because "[i]f Treasury officials and staff believe that such exchanges could become public, they are unlikely to feel at liberty to offer their candid opinions." (Dickerman Decl. ¶ 49.)  "The reluctance of Treasury officials and staff to share their candid opinions, and the bases for them, would restrict Treasury's ability to advise decisionmakers on candidates for appointment to important governmental positions . . . including the President." (*Id.*)  In addition, since some of this information was obtained from the candidates themselves during vetting interviews, releasing this information could discourage candidates for future positions from speaking candidly.  (*Id.* ¶ 50.)  Candor in vetting interviews is of "critical importance," as the government employee asking the questions "is seeking to understand both nonpublic views held by the candidate as well as non-public information that could be embarrassing or harmful if it later became public." (*Id.*)  Candidates' reluctance to speak candidly would "deprive Treasury of valuable information necessary to its deliberations," which "would adversely affect Treasury's ability to assist decisionmakers in selecting and appointing individuals." (*Id.*)  Finally, with regard to the records containing proposed timelines, Treasury states that "[t]heir release would be harmful,

because it would create confusion about whether the government followed the process points that were outlined." (*Id.* ¶ 52.) Plaintiffs do not specifically challenge this asserted basis for foreseeable harm.

Plaintiffs contend that Treasury cannot simply rely on generalized assertions that disclosure could chill deliberations to justify withholding records under the FIA's foreseeable-harm provision. (ECF No. 87 at 22.) Here, Treasury specifically focused on the information at issue, and it concluded that disclosure of that information would chill future internal discussions and interviews. Treasury has met its burden of establishing foreseeable harms that would arise from disclosure of the material, as required under the FIA, 5 U.S.C. § 552(a)(8)(A)(i)(I). *See Machado Amadis v. United States Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020); *Tobias v. United States Dep't of the Interior, Off. of Sec'y*, No. 18-CV-01368, 2021 WL 4262488, at *2 (D.D.C. Sept. 20, 2021) ("[The agency] has adequately demonstrated through its declarations that foreseeable harm would result from production of the information it has withheld. Each declaration focuses on the information at issue, and each concludes that disclosure would chill future internal discussions or otherwise 'harm an interest protected by an exemption.'")

The Court concludes that Treasury's withholdings under the deliberative process privilege pursuant to FOIA Exemption 5 were proper. [3]

---

[3] All but three of the challenged records (UST_1360, UST_2795-98, and UST_2862) are withheld in part pursuant to the deliberative process privilege. (Dickerman Decl. ¶ 45.)

In UST_1360 and UST_2795-98, Treasury withheld the names of low-level Treasury employees who did not play a substantive role in the selection of Board members pursuant to FOIA Exemption 6. (Dickerman Decl. ¶ 66.) Plaintiffs have withdrawn their challenges to redactions in records that contain the names of low-level Treasury employees (ECF No. 87 at 10 n.4), and the Court thus does not address the applicability of Exemption 6 to the names of the low-level Treasury employees.

In UST_2862, Treasury withheld material pursuant to the attorney-client privilege under FOIA Exemption 5. (Dickerman Decl. ¶ 54.) In their cross-motion for summary judgment, Plaintiffs challenged Treasury's withholding of material in UST_2862 pursuant to the attorney-

## IV. Conclusion

For the foregoing reasons, Treasury's motion for summary judgment is GRANTED, and Plaintiffs' cross-motion for summary judgment is DENIED.

The Clerk of Court is directed to close the motions at ECF Nos. 81 and 86 and to close this case.

SO ORDERED.

Dated: March 5, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

client privilege. (ECF No. 87 at 24.) However, Plaintiffs subsequently withdrew this challenge (ECF No. 91 at 8 n.7), and the Court therefore does not address the applicability of the attorney-client privilege.

The records withheld in part pursuant to the presidential communications privilege are UST_2389-97, UST_2398-4000, and UST_2862. The parts of UST_2389-97 and UST_2398-4000 withheld pursuant to the presidential communications privilege are also withheld under the deliberative process privilege. (Dickerman Decl. ¶ 57.) The part of UST_2862 withheld pursuant to the presidential communications privilege is also withheld under the attorney-client privilege, which Plaintiffs do not challenge. (Dickerman Decl. ¶ 61.) The Court thus does not address the applicability of the presidential communications privilege. (*See* ECF No. 82 at 19-20 n.7.)

Finally, because all the material Treasury withheld on privacy grounds pursuant to Exemption 6 is also withheld as privileged, the Court need not reach the applicability of Exemption 6, as it has determined that the records are protected under Exemption 5. (*See* ECF No. 89 at 2, 17.)